OPINION OF THE COURT
SEITZ, Circuit Judge.
The National Farmers’ Organization, Inc. (“NFO”) and Cumberland Farms Dairy, Inc. (“Cumberland”) appeal from a final order of the district court, which dismissed as moot their appeals from an order of the bankruptcy court. This court has jurisdiction over their appeals by virtue of 28 U.S.C. §§ 158(d) and 1291.
I.
On August 10, 1984, Abbotts Dairies of Pennsylvania, Inc., Pennbrook Foods Company, Inc., The Pennbrook Corporation, Ab-botts Realty Inc., and Abbotts Holding Company, Inc. (hereinafter referred to collectively as “Abbotts”), filed petitions for relief under Chapter 11 of the Bankruptcy Code (the “Code”), 11 U.S.C. §§ 1101-1174. On the same day, Abbotts filed motions for approval of two agreements it had entered into with ADC, Inc. (“ADC”): an “Interim Agreement Concerning Sale of Inventory and Lease of Certain Assets” (the “Interim Agreement”); and an “Asset Purchase and Lease Agreement” (the “Purchase Agreement”).
The bankruptcy court held an emergency hearing that afternoon to consider Abbotts’ motion for approval of the Interim Agreement, whereby ADC would effectively take *145 over Abbotts’ business.[1] Notice of the hearing had been given only to the Philadelphia National Bank (“PNB”) and Fair-mont Pennsylvania Holdings, Inc. (“Fair-mont”), Abbotts’ two secured creditors, both of whom were represented at the hearing. Also present, almost by chance, was an attorney representing three of Ab-botts’ unsecured creditors, and Cream-O-Land Dairies, a prospective purchaser of the business.
In support of its motion, Abbotts’ Chairman and Chief Executive Officer, Richard H. Gwinn, testified that PNB notified Ab-botts in February of 1984 that it had defaulted on its loans, and that if Abbotts did not obtain financing from another lender, PNB would reduce Abbotts’ line of credit at a rate of $100,000 per week.[2] He also stated that unless the bankruptcy court approved the Interim Agreement, the company would have to cease operations when its current inventory was exhausted on August 11 (the next day), because it had no excess working capital with which to purchase any more milk. Finally, Mr. Gwinn opined that if Abbotts ceased operations, its trademarks and customer list would lose substantially all of their value, resulting in a loss of $3 to $4 million to the estate.
On cross-examination by counsel representing one secured creditor, a prospective bidder, and three unsecured creditors, Mr. Gwinn testified that he had reached an informal agreement to act as a consultant to ADC during the pendency of the bankruptcy proceedings, at his current salary of $150,000 per year — provided that the bankruptcy court approved the Interim Agreement. He also testified that he had been offered a senior executive position with ADC for five years, once again at his current salary, and that he hoped that ADC would relieve him from personal liability on several of Abbotts’ obligations — provided, once again, that the bankruptcy court approved ADC’s purchase of Abbotts’ assets.
At the conclusion of the hearing, the bankruptcy court entered an order approving the Interim Agreement. This order was supplemented by an order entered on August 17, 1984, which required ADC and its employees to hold themselves out as Abbotts’ representative; to maintain, where possible and economically feasible, Abbotts’ existing distribution system; to continue to distribute products under the Abbotts’ trademarks and not act affirmatively to switch its customers to products sold under other trademarks; and to act reasonably so as not to prejudice the rights of Abbotts’ creditors or diminish the value of its trademarks. These provisions represented concessions that Fairmont had extracted from Abbotts and ADC during the course of the hearing, which Fairmont hoped would preserve Abbotts’ value as a going concern until the bankruptcy court could consider the Purchase Agreement and any other competing bids for Abbotts’ assets.
Notice of the motion for approval of the Purchase Agreement was then sent to all interested parties. The notice summarized the Purchase Agreement, and set a deadline for objections to it, as well as for “higher or better” bids for Abbotts’ assets. The notice did not, however, reveal that Mr. Gwinn was presently employed by ADC as a “consultant,” nor did it indicate that he had been offered a permanent position with ADC, conditioned upon closing pursuant to the Purchase Agreement. Likewise, the notice did not indicate that an *146 emergency hearing had been held on August 10, nor did it summarize the terms of the Interim Agreement that had been approved at that hearing; rather, the notice simply stated that “[ADC] previously purchased the inventories and has been in possession of certain operating equipment and facilities of [Abbotts] and have continued certain operations of Abbotts ... under an Interim Agreement pending approval by the Bankruptcy Court of the [Purchase] Agreement.”
Three parties filed objections to the sale, only one of which — that filed by Fair-mont — is at all pertinent to the present appeals. Fairmont asserted, inter alia, that the sale of Abbotts’ assets should not be approved until a disclosure statement had been approved by the court and a plan of reorganization confirmed by Abbotts’ creditors, because of a number of factors (including the Interim Agreement) that might chill the bidding for Abbotts’ assets. Fairmont also objected to the lack of any appraisals of Abbott’s assets, and argued that the “value” to be paid by ADC was insufficient.
Three parties submitted bids: ADC, Cumberland, and Atlantic Processing, Inc. (“API”). ADC’s bid (the Purchase Agreement) contemplated, inter alia, the purchase of Abbotts’ trademarks and customer list for a guaranteed minimum payment of $1 million. API sought to purchase Ab-botts’ trademark only for a cash payment of $1,250,000. Finally, Cumberland submitted two alternative bids. The first contemplated a guaranteed minimum payment for Abbotts’ trademarks and customer list of $1,100,000; the second a guaranteed minimum payment of $1,500,000.
Cumberland’s bids, however, were subject to certain conditions. For example, both required the bankruptcy court to rescind Section 7.2(d) of the Interim Agreement, which it had expressly approved in a prior order.[3] Similarly, both bids delayed the closing for approximately ten days, during which time ADC would still be required to operate Abbotts. Finally, the second bid required the court to restrain ADC from competing with Cumberland for any of Abbotts’ customers for 90 days.
The bankruptcy court held a hearing on the Purchase Agreement on September 12. At its conclusion, the bankruptcy court refused to impose the conditions Cumberland sought,[4] after which Cumberland and API withdrew their bids. Fairmont then sought to support its objections to the Purchase Agreement through the testimony of approximately ten witnesses who were present at the hearing. The bankruptcy court refused to hear this evidence; instead, it brought the auction to a close, and signed an order confirming the sale to ADC. In the order, the court found that “it appear[s] that the prices for the sale of the assets ... are fair and reasonable, that the sale and lease are in the best interest of the estate[ ] of [Abbotts] and [its] creditors, [and] that the assets will substantially diminish in value if not immediately sold.” In re Abbotts Dairies, et al., No. 84-02623G, slip op. at 1 (Bankr.E.D.Pa. Sept. 12, 1984).
Fairmont, Cumberland, and NFO filed timely notices of appeal to the district court; Fairmont alone, however, sought a stay pending appeal. When the bankruptcy court initially enjoined the sale pending *147 determination of Fairmont’s motion for a stay, Fairmont, Abbotts, and ADC met and entered into a stipulation under which Fair-mont withdrew its appeal and motion for a stay. The bankruptcy court then vacated its order enjoining the sale. With no stay in effect, ADC and Abbotts closed the sale pursuant to the terms of the Purchase Agreement; notice thereof was filed on September 14, 1984.
After it had closed the sale to ADC, Abbotts filed a motion to dismiss the Cumberland and NFO appeals as moot pursuant to 11 U.S.C. § 363(m). The district court, by order dated July 30, 1985, granted the motion. After reviewing the record in the bankruptcy court, the district court concluded that “[ajppellants have not shown a lack of good faith on the part of ADC so as to justify their failure to seek a stay, and so the appeal is dismissed.” In re Abbotts Dairies, et al, Civil Action No. 84-5118, slip op. at 2 n. 1 (E.D.Pa. July 30, 1985).
II.
The Code provides that “[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.” 11 U.S.C. § 363(b)(1). It also provides that
[t]he reversal or modification on appeal of an authorization under subsection (b) ... of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such ... sale or lease were stayed pending appeal.
Id. § 363(m) (emphasis added). The latter provision reflects the salutary “ ‘policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.’ ” Hoese Corp. v. Vetter Corp. (In re Vetter Corp.), 724 F.2d 52, 55 (7th Cir.1983) (quoting 14 Collier on Bankruptcy 11-62.03 at 11-62-11 (14th ed. 1976)).
In the present case, neither NFO nor Cumberland sought to stay the bankruptcy court’s September 12 order. They assert that a stay was not necessary, however, because the present record will not, as a matter of law, support a finding that ADC purchased “in good faith”; alternatively, they argue that we should remand the matter to permit them to develop a record on the controlling good faith issues. Because the question of whether ADC was a good faith purchaser requires the determination of an ultimate fact, Greylock Glen Corp. v. Community Sav. Bank, 656 F.2d 1, 3 (1st Cir.1981), our standard of review is mixed; we exercise plenary review of the legal standard applied by the district and bankruptcy courts, but review the latter court’s findings of fact on a clearly erroneous standard, Universal Minerals v. C.A. Hughes & Co., 669 F.2d 98, 103 (3d Cir.1981); Fed.R.Bankr.P. 8013.
Unfortunately, neither the Bankruptcy Code nor the Bankruptcy Rules attempts to define “good faith.” Courts applying section 363(m) (and its predecessor, Fed.R. Bankr.P. 805) have, therefore, turned to traditional equitable principles, holding that the phrase encompasses one who purchases in “good faith” and for “value.” See, e.g., In re Bel Air Assocs., 706 F.2d 301, 305 (10th Cir.1983); In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1197 (7th Cir.1978).
A.
“The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser’s good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.” In re Rock Indus. Mach. Corp., 572 F.2d at 1198; see also Taylor v. Lake (In re Cada Invs.), 664 F.2d 1158, 1162 (9th Cir.1981) (“Courts have generally appeared willing to set aside confirmed sales that were ‘tinged with fraud, error or similar *148 defects which would in equity affect the validity of any private transaction.’ ”).
In the present case, the bankruptcy court did not make an explicit finding of “good faith” as to ADC’s behavior in the course of the sale proceedings. ADC and Abbotts argue, however, that the court implicitly made such a finding, in that “it simply would not have approved the sale to ADC if it had thought otherwise.” Alternatively, they seek to rely upon the district court’s conclusion that NFO and Cumberland “have not shown a lack of good faith on the part of ADC so as to justify their failure to seek a stay.” In re Abbotts Dairies, et al., No 84-5118, slip op. at 2 n. 1. Under the circumstances, we find both of these arguments unpersuasive..
First, we reject the claim that the bankruptcy court made an “implicit” finding of good faith. The factual findings upon which ADC and Abbotts base this assertion go only to the need to act immediately so as to avoid any diminution in the value of Abbotts’ trademarks and other assets. NFO’s and Cumberland’s assertion of collusion, on the other hand, concerns, inter alia, the claim that the “emergency” justifying the immediate sale of Abbotts was itself contrived or orchestrated by ADC and Abbotts. For example, they claim that — in exchange for a lucrative employment agreement for Mr. Gwinn, Abbotts’ Chairman and Chief Executive Officer— Abbotts permitted ADC to manipulate the timing of Abbotts’ bankruptcy so that the bankruptcy court had no choice but to approve the Interim Agreement on August 10, the terms of which were designed to preclude any truly competitive bidding for the assets on September 12. Surely, if NFO and Cumberland substantiated these claims, it would, as a matter of law, constitute “collusion between the purchaser and ... trustee [or in this case, the debtor-in-possession], or an attempt to take grossly unfair advantage of other bidders,” sufficient to destroy ADC’s “good faith status.” In re Rock Indus. Mach. Corp., 572 F.2d at 1198.
We also reject the attempt to rely upon the district court’s conclusion to the contrary, which was apparently premised upon the assumption that “[n]o objections to the sale on the basis of fraud, collusion or insufficient value were raised at the [September 12] hearing.” In re Abbotts Dairies, et al., No. 84-5118, slip op. at 2 n. 1. That assumption is not, however, borne out by the record.
For example, prior to the September 12 hearing, Fairmont filed a number of written objections to the proposed sale that were relevant to the issue of ADC’s “good faith.” These included, inter alia, claims that certain terms of the Interim Agreement had “chilled” the bidding for Abbotts and that insufficient value was being paid by ADC. Similarly, during his argument before the bankruptcy court, Cumberland’s counsel questioned the assertion by Ab-botts’ counsel that an “emergency” existed that required the sale of Abbotts prior to the approval of a disclosure statement and confirmation of a plan of reorganization; he also argued that the Interim Agreement gave an undue advantage to ADC vis-a-vis other prospective bidders, which significantly depreciated the overall value of the company.
Finally, there is no indication in the district court’s opinion that it reviewed the record of the August 10 “emergency” hearing in the bankruptcy court; we believe, however, that the court should have done so before it dismissed the appeals from the bankruptcy court. That hearing, and the circumstances surrounding approval of the Interim Agreement, was an integral part of the “sale” of Abbotts; as such, it must be considered in conjunction with the actual sale of the company at the September 12 hearing. The record from that hearing, moreover, indicates that counsel for a prospective bidder and three unsecured creditors filed a number of written objections going to ADC’s “good faith.” They included, for example, the claim that the Interim Agreement so greatly diminished Abbotts’ value as to “create a situation where all competitive bidding for [Abbotts’] business would be eliminated, leaving [ADC] to purchase [Abbotts] at an inadequate price, to the detriment of all interested parties.”
*149 Under these circumstances, then, the district court erred when it dismissed the present appeals as moot. Considering ADC’s lucrative offer of employment to Mr. Gwinn, the timing of Abbotts’ petitions in bankruptcy, and its motion for approval of the Interim Agreement, the situation was ripe for collusion and interested dealing between ADC and Abbotts. Cf. Wolverton v. Shell Oil Co., 442 F.2d 666, 669-70 (9th Cir.1971) (affirming district court order setting aside private sale of an antitrust cause of action by the trustee to the bankrupt, because “a sale to the bankrupt, especially when it is of an asset such as a cause of action of unknown but potentially great value, as here, offers opportunities for skulduggery that make it suspect”). Thus, the district court should have remanded the matter to the bankruptcy court for a finding as to whether ADC purchased Abbotts’ assets “in good faith,” or whether ADC and Abbotts (through Mr. Gwinn) colluded in an attempt to take unfair advantage of prospective bidders like Cumberland; it should not have taken it upon itself to determine this question in the first instance. See, e.g., In re Bleaufontaine, Inc., 634 F.2d 1383, 1386 (5th Cir.1981) (district court remanded appeals from an order approving the sale of the debtor’s assets to bankruptcy court with directions to determine the good faith status of the purchaser).
B.
Traditionally, courts have held that “[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets.” In re Rock Indus. Mach. Corp., 572 F.2d at 1197 n. 1. In the present case, no appraisal of Abbotts’ assets was conducted or introduced in the bankruptcy court. ADC argues, however, that a public “auction,” as opposed to appraisals and other evidence, is the best possible determinant of the value of Abbotts’ assets; alternatively, ADC and Abbotts argue that we are bound by the bankruptcy court’s finding that the prices paid for Abbotts’ assets “are fair and reasonable.”
Generally speaking, an auction may be sufficient to establish that one has paid “value” for the assets of a bankrupt. In the present case, on the other hand, we reject the assertion that the “auction” conducted for Abbotts’ assets necessarily establishes that ADC paid “value.” If Abbotts and ADC colluded with respect to the timing of Abbotts’ petitions for bankruptcy and its motion to approve the Interim Agreement in an attempt to chill the bidding for the assets involved, it would follow that no “auction” took place in the bankruptcy court; thus, the “bidding” could not, by definition, serve as the final arbiter of the “value” of Abbotts’ assets.
Similarly, in the absence of a finding of “good faith” behavior by ADC, we find Abbotts’ and ADC’s reliance upon the bankruptcy court’s finding that the prices paid “are fair and reasonable” equally unavailing. Neither party introduced any evidence going to value, and the bankruptcy court refused to entertain the only proffer of such evidence — that is, Fairmont’s proffer of evidence in support of its objection to the value to be paid by ADC. Instead, the bankruptcy court, like ADC, apparently believed that the “auction” it conducted adequately and conclusively established that value was paid.
Accordingly, if the bankruptcy court finds, on remand, that ADC did not purchase Abbotts’ assets “in good faith,” it will have to determine whether ADC indeed paid “value” for Abbotts. On the other hand, if it finds that ADC did act “in good faith,” then its finding that the prices paid “are fair and reasonable” is not clearly erroneous, and is sufficient to establish that ADC paid “value” for Abbotts’ assets. See Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir.1985) (“[T]he bankruptcy court’s express finding that the $100,000 price was ‘not unreasonable,’ a finding that is not clearly erroneous, demonstrates that Hampshire indeed gave value for the interest.”).
C.
In short, we hold that when a bankruptcy court authorizes a sale of assets *150 pursuant to section 363(b)(1), it is required to make a finding with respect to the “good faith” of the purchaser. Alternatively, such a finding might, in certain very limited circumstances, be made by the district court. See, e.g., Greylock Glen Corp. v. Community Sav. Bank, 656 F.2d 1, 3 (1st Cir.1981) (district court “decided the issue of ultimate fact — the bank’s good faith — on the basis of underlying facts that are not in dispute); In re Combined Metals Reduction Co., 557 F.2d 179, 185 (9th Cir.1977) (district court did not refer the matter to the bankruptcy court, electing instead to retain control of the Chapter X proceeding itself).
We think that such a requirement represents a proper exercise of our supervisory authority over both the district and bankruptcy courts. First, the bankruptcy court, given its greater familiarity with the parties and proceedings, represents the forum best able to make such a determination in the first instance. Second, it encourages finality of the bankruptcy court’s judgments under section 363(b)(1), because it places prospective appellants on notice of the need to obtain a stay pending appeal, or face dismissal for mootness pursuant to section 363(m), should the district court affirm the bankruptcy court’s finding of good faith. Finally, such a procedure ensures that section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and, as such, it mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor’s reorganization plan and make a finding that it “has been proposed in good faith and not by any means forbidden by law.” 11 U.S.C. § 1129(a)(3).[5]
IV.
Relying upon In re Combined Metals Reduction Co., 557 F.2d at 179, and In re Royal Properties, 621 F.2d 984 (9th Cir.1980), ADC and Abbotts assert that even if the present appeals are not moot by virtue of section 363(m), they are moot under Article III, because the relief sought by NFO and Cumberland — that is, the undoing of the sale — can no longer be effectively granted by this court.[6] In support of this contention, they argue that “[mjillions of dollars have been paid by ADC, hundreds of former employees of Abbotts are now employees of ADC, with attendant vesting of rights under labor union contracts, various distribution routes and customer relationships have been established, capital assets have been acquired and used, and innumerable other irreversible measures have been taken in justifiable reliance on the finality of the Bankruptcy Court’s order approving the Purchase Agreement.” NFO argues, on the other hand, that approval of this line of argument would effectively read the “good faith” requirement of section 363(m) out of the Code.
The short answer to this claim is that neither ADC nor Abbotts has “borne [the] burden of showing that the outcome *151 of this appeal could not affect the legal interests of the parties.” Ohio v. Madeline Marie Nursing Homes #1 and #2, 694 F.2d 449, 463 (6th Cir.1982); see also In re King Resources Co., 651 F.2d 1326, 1332 (10th Cir.1980) (“Before refusing to consider these appeals on the merits because of consummation which has occurred, some hearing and development of a record would be required____”). They did not introduce any evidence in either the district or bankruptcy court to substantiate the claim that the property purchased from Abbotts has been irreversibly commingled with that of ADC. We believe, therefore, that this question is more properly decided on remand. Cf. e.g., In re AOV Indus., 43 B.R. 468, 475-76 (D.D.C.1984) (considering, on remand from Court of Appeals, whether the transferees under the plan are good faith transferees, and whether the plan has been so far consummated that the court can no longer grant effective relief).
With respect to NFO, however, we are generally confident that the present appeal is not moot. Unlike Cumberland, NFO can be made whole without undoing the sale. We need not belabor the fact that a bankruptcy court is, after all, a court of equity, In re Beck Indus., 605 F.2d 624, 634 (2d Cir.1979) (Friendly, J.), which “[i]n the exercise of its equitable jurisdiction ... has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate,” Pepper v. Litton, 308 U.S. 295, 307-08, 60 S.Ct. 238, 245-46, 84 L.Ed. 281 (1939). As a result, a bankruptcy court has broad remedial powers with which to fashion relief for parties such as NFO. See In re Beck Indus., 605 F.2d at 637. For example, in the present case a profitable analogy might be made to section 363(n) of the Code, which provides, inter alia, that the trustee may recover from a party engaged in collusive bidding any excess of value over the purchase price plus attorneys’ fees and costs, and, where appropriate, punitive damages. Similarly, the court might consider whether Abbotts, as a debtor-in-possession, violated its fiduciary duties to its creditors, thus subjecting it or its principals to liability.
V.
To conclude, the bankruptcy court should, upon remand of this matter from the district court, determine whether there was any impermissible collusion between ADC and Abbotts that would negate ADC’s status as a purchaser “in good faith.” If it finds such collusion, it should then determine whether ADC paid “value” for the assets purchased. If the court determines that ADC did not pay “value,” it will then have to determine whether it has the power to undo the sale to ADC; implicit in this determination is the question whether, with respect to Cumberland, the sale has become moot under Article III. Finally, if the court determines that it has the power to undo the sale, it should, in an exercise of its equitable jurisdiction, determine whether to exercise that power, or whether another remedy should be pursued.
Accordingly, the district court’s judgment will be reversed, and the matter remanded to the district court with instructions to remand it to the bankruptcy court for proceedings consistent with this opinion.

. Under the terms of the Interim Agreement, ADC agreed to purchase Abbotts’ existing inventory at cost; to lease its trademarks; to maintain deliveries to current customers; to employ approximately 250 of Abbotts’ 300 employees; and to collect, for a commission, approximately $6 million in outstanding accounts receivable. ADC did not, however, assume any of Abbotts’ financial obligations with respect to its various facilities, and it also expressly retained the right to compete with Abbotts for customers and to continue to serve Abbotts’ customers under a different label if the Purchase Agreement was not ultimately approved.

. Abbotts apparently had a line of credit at PNB equal to 65% of its qualified accounts receivable; at the time of the August 10 hearing, its outstanding loan balance totalled approximately $3.3 million.

. The bankruptcy court’s August 10 order provided that
pursuant to Section 7.2 of the Interim Agreement, if the Interim Agreement is terminated other than by Closing as provided for in the [Purchase Agreement], then ADC, Inc. shall immediately notify all current customers ... that it will no longer be able to supply them with product under [Abbotts'] Trademarks; but ADC, Inc. may, if it so desires, notify [them] that it will be able to serve them with product under another name.
In re Abbotts Dairies, et al., No 84-02623, slip op. at 2-3 (Bankr.E.D.Pa. Aug. 10, 1984) (emphasis added).

. With respect to Cumberland’s request to extend the time for closing the sale by ten days, the court stated that "with the losses that are being sustained by the present conductor of the Debtor’s business [that] is unreasonable”— based, apparently, on the unsworn and unsubstantiated assertion of counsel that ADC was "losing money at the rate of $10,000.00 per day.”

. Admittedly, the definition of "good faith” in the two situations differs somewhat. Compare supra typescript at 9-15 (definition of good faith for purposes of § 363(b)(1) and 363(m)), with e.g., In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir.1984) (“[F]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.”). The purpose of requiring such a finding in each situation, however, is quite similar: it prevents a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11.

. Generally speaking, an appeal must be dismissed as moot when an event occurs that prevents the appellate court from granting any effective relief, even if the dispute is decided in favor of the appellant. In re Combined Metals Reduction Co., 557 F.2d at 187; Brill v. General Indus. Enters., 234 F.2d 465, 469 (3d Cir.1956); see also Mills v. Green, 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293 (1895) (holding that it is the duty of each federal court to “decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before [it]”). This follows from the fact that the federal courts, as courts of limited jurisdiction, are limited to deciding only actual "cases or controversies.”