In re PENNSYLVANIA TRUCK LINES, INC., Debtor.

OFFICIAL UNSECURED CREDITORS' COMMITTEE OF PENNSYLVANIA TRUCK LINES, INC., Appellant,

v.

PENNSYLVANIA TRUCK LINES, INC., Appellee.

Civ. A. No. 92–3696.
Bankruptcy No. 92–12370S.

United States District Court, E.D. Pennsylvania.

Dec. 31, 1992.

Robert M. Bovarnick, Adelman, Lavine, Gold & Levin, Barry D. Kleban, Philadelphia, PA, for Pennsylvania Truck Lines, Inc.

Pennsylvania Truck Lines, Inc., pro se.

Alan R. Gordon, Philadelphia, PA, for Official Committee of Unsecured Creditors.

Kent Cprek, Sanford G. Rosenthal, Sagot, Jennings & Sigmond, Philadelphia, PA, for Teamsters Pension Trust Fund of Philadelphia and Vicinity.

William H. Johnson, Philadelphia, PA, for Conrail, CRR Investments, Inc.

Frederick Baker, pro se.

## MEMORANDUM AND ORDER

DITTER, Senior District Judge.

The Official Unsecured Creditors' Committee of a debtor, Pennsylvania Truck Lines, Inc. ("Penn Truck"), appeals from an order of the bankruptcy court approving the compromise of a controversy between Penn Truck and two of its major creditors, Consolidated Rail Corporation ("Conrail") and CRR Investments, Inc. (together, "the Conrail Group"). For the reasons that follow, I will affirm the order of the bankruptcy court and deny Penn Truck's motion to dismiss the appeal as moot.

### I. *Background*

This case arises from a pair of settlement agreements reached on April 8, 1992, one between the Conrail Group and Penn Truck ("the Penn Truck agreement"), and the other between the Conrail Group, Penn Truck's affiliates, and James G. Cunningham, a Penn Truck officer [1] (the "affiliates agreement"). Penn Truck is a trucking services company, formerly owned by Conrail. Penn Truck's "affiliates" are its two sister companies, PTL Intermodal, Inc. ("Intermodal") and PTL Terminal Services, Inc. ("Terminal Services"), and their parent company, PTL Transportation Services, Inc. ("Parent").

The Penn Truck agreement is the one at issue in this appeal. The affiliates agreement merits discussion first, however. In that agreement, executed the same day as the Penn Truck agreement, the Conrail Group agreed to forgive approximately $10 million in loans and loan guarantees owed

by the affiliates and Cunningham, and to transfer cash to the affiliates as soon as the Penn Truck agreement was approved. Further, the parties mutually released all potential legal claims. *See Settlement Agreement, Appendix to Brief of Appellant,* Exhibit J.

This agreement went into effect immediately on April 8, 1992. It never needed bankruptcy court approval since none of the Conrail Group, the affiliates, or Cunningham was in bankruptcy.

The Penn Truck agreement, however, obligated Penn Truck to file for bankruptcy and promptly seek approval of the remaining settlement agreement terms. Those terms provided that the Conrail Group would pay Penn Truck $985,000 (as cash and a secured loan, to be forgiven upon consummation of the agreement); help Penn Truck recover inventory and equipment it had left behind at Conrail terminals; release its legal claims against Penn Truck; and permit Penn Truck to re-enter certain long-term trucking contracts, provided that Penn Truck negotiated a new collective bargaining agreement with its employees.

In exchange, Penn Truck agreed to release the Conrail Group from all legal liability. *See Settlement Agreement, Appendix to Brief of Appellant,* Exhibit I.

On May 20, 1992, Judge David A. Scholl of the Bankruptcy Court for the Eastern District of Pennsylvania held a six-hour hearing to evaluate the fairness of the Penn Truck Agreement. The Committee of Unsecured Creditors objected to the compromise of the Penn Truck claims. The Committee argued that the two settlement agreements together released Conrail, the affiliates, and Cunningham from all liability and left Penn Truck—and ultimately its creditors—fully exposed. Joined by the Teamster employees, the Committee urged Judge School to reject the settlement. Cunningham and Jeffrey C. Lang, a principal officer of Penn Truck and of Terminal Services, countered that this settlement

---

1. Cunningham is also an officer of two of the affiliates.

with the Conrail Group was the only way Penn Truck could stay in operation.

The following day, Judge Scholl approved the Penn Truck settlement agreement. He stated this was "for reasons appearing of record in the court's statements at the close of the hearing" and cited *In re Grant Broadcasting of Phila., Inc.,* 71 B.R. 390, 395–96 (Bankr.E.D.Pa.1987). On May 29, 1992, the Committee asked him for a stay of the approval order pending appeal and an expedited hearing, which Judge Scholl denied. On June 1, 1992, the Committee petitioned this court for a stay. I denied the Committee's motion on June 2, 1992. This appeal of the approval order followed.[2]

## II. *The Order on Appeal*[3]

■ There are essentially two questions on appeal: whether Judge Scholl used the correct standard to evaluate the settlement of a controversy under Federal Bankruptcy Rule 9019(a)[4]; and, if so, whether he applied that standard correctly to the facts of this Penn Truck settlement agreement.[5] The first is a question of law subject to plenary review, *see Goldberg v. New Jersey Lawyers' Fund,* 932 F.2d 273, 277 (3d Cir.1991). The second also requires independent district court review but "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not

be disturbed on appeal absent a clear abuse of discretion." *In re Neshaminy Office Bldg. Associates,* 62 B.R. 798, 803 (E.D.Pa. 1986).

### A. *Standard for Approving a Settlement Under Rule 9019(a)*

■ Judge Scholl approved the Penn Truck agreement using the test set forth in *Grant Broadcasting.* In that case, Judge Scholl had held there are "but four considerations which a Court must address in determining the fairness, reasonableness, and adequacy of a settlement: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Grant Broadcasting,* 71 B.R. at 395. A bankruptcy court must consider these factors "to see whether the settlement falls below the lowest point in the range of reasonableness," *id.* (internal quotations and citations omitted).

At the hearing, the Committee pointed to the insider involvement in the Penn Truck settlement agreement and urged Judge School to apply a stricter evaluatory test than just "lowest point in the range of reasonableness." The Committee argued the court must apply a higher level of

---

2. The appeal is brought by both the Committee of Unsecured Creditors and the Teamsters Pension Trust Fund of Philadelphia and Vicinity (the "Philadelphia Fund"). In the bankruptcy court, the Teamsters National Freight Industry Negotiating Committee ("TINFINC") and the Central States, Southeast and Southwest Areas Health and Welfare and Pension Funds ("the Funds") also objected to the settlement agreement, but TINFINC has withdrawn its appeal and the Funds never filed one.

3. This court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a).

4. Federal Bankruptcy Rule 9019(a) states:
   **Compromise.** On motion by the trustee and after a hearing on notice to creditors, the United States trustee, the debtor and indenture trustees as provided in Rule 2002 and to such other entities as the court may designate, the court may approve a compromise or settlement.

5. A third question regards whether Penn Truck, as a debtor-in-possession, had the power to enter into this agreement without approval of the creditors. The Philadelphia Fund contends that this settlement was either 1) an "extraordinary act" like a sale of assets, requiring disclosure and a vote of the creditors; or 2) a *de facto* plan of reorganization, which also requires creditor approval. Judge Scholl rejected both of these arguments and they will be discussed herein.

Finally, Penn Truck contends the order may be affirmed on its alternative ground—as the assumption of a pre-petition executory contract, rather than as the approval of a compromise of a controversy. The Committee is quite right that this alternative ground was never raised in the bankruptcy court. Since I will affirm Judge Scholl's order under Rule 9019(a), however, I need not address this alternative ground for affirmance.

scrutiny to settlements such as this, where the debtor's negotiators secure for themselves releases from loans and liability, than to arms-length settlements negotiated by independent trustees. In support of this higher level of scrutiny, the Committee cited *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir.1986), *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493 (Bankr.S.D.N.Y.1991), and in its brief on appeal, *In re The Present Co., Inc.*, 141 B.R. 18 (Bankr.W.D.N.Y.1992).

### 1. *Abbotts Dairies* and the Sale of Assets under 11 U.S.C. § 363(b)

In *Abbotts Dairies*, the Third Circuit reversed a district court finding that an appeal from a bankruptcy court order approving the sale of a debtor's assets under 11 U.S.C. § 363(b) was moot. Based on evidence that the sale had been orchestrated between insiders, and that some of the conditions of the sale were not disclosed to the debtor's creditors, the court of appeals remanded the case to the bankruptcy court to determine whether the insiders had acted in good faith. *See Abbotts Dairies*, 788 F.2d at 149. If they had, the court explained, the sale should be approved. If they had not, the sale could still be approved, provided the buyer had paid fair value. *See id.* However, the court ruled, even if the buyer had not paid fair value, the sale might still not be reversed, if the bankruptcy court determined that reversal at that late stage was so inequitable as to render the creditors' petition moot. *See id.* at 151.

The Creditors' Committee in this case asked Judge Scholl to scrutinize the Penn Truck agreement for good faith, contending none would be found since Penn Truck insiders had negotiated the agreement in their own interest and at the expense of Penn Truck's creditors.

Judge Scholl rejected that request. He maintained the distinction he had expressed in *Grant Broadcasting:* that *Abbotts Dairies* pertains only to sales of assets under 11 U.S.C. § 363(b) and not to settlements of claims under Bankruptcy Rule 9019(a). Settlements of pre-petition claims require less review than post-petition sales or leases of assets, Judge Scholl had explained, because settlements must be moved through quickly to be sure that creditors can resolve claims without waiting for a full reorganization plan. *See Grant Broadcasting*, 71 B.R. at 398. Indeed, such settlements often form an "important and necessary first step for the Debtor in formulating a Plan." *Id. See also In re Neshaminy Office Bldg. Associates*, 62 B.R. at 805 ("... it is [not] proper to equate the settlement of this controversy over conflicting claims [to a property] with the sale of that property.")

■ On appeal, the Philadelphia Fund contends the Penn Truck settlement should have received at least as much scrutiny as a sale of assets, because Penn Truck disposed of what amounts to its "crown jewel assets," its lawsuits against Conrail. I stand by Judge Scholl's distinction between settlements of pre-petition claims and post-petition sales of assets. Until the Third Circuit says that the good faith requirement of *Abbotts Dairies* applies to settlements of controversies, I will decline to extend it that far. In any event, as will be discussed below, I disagree that Penn Truck's causes of action against Conrail constituted "crown jewels" worth saving.[6]

### 2. The New York Bankruptcy Cases

The other two cases appellants cite in support of a stricter test for "insider" settlements do involve settlements of controversies. But neither changes the result here. In *In re Drexel Burnham Lambert Group*, 134 B.R. 493, the Bankruptcy

---

**6.** For the same reason, I reject the Philadelphia Fund's argument that this settlement was actually a *de facto* reorganization plan. Concerns of *de facto* or "creeping" reorganization plans generally arise in the context of asset sales, which this is not. *See In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir.1986). In any event, appellants have not specified what protection they have been denied by virtue of Penn Truck's choice to settle its pre-petition claims, rather than include them in a plan of reorganization. Indeed, by virtue of the settlement, Penn Truck remains independent and free to fashion its own plan now.

Court for the Southern District of New York approved a settlement agreement as falling "above the lowest point in the range of reasonableness," *id.* at 497. In its penultimate paragraph, however, the court added:

> We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable.

*Id.* at 498.

Clearly, this discussion is dicta. Similarly, in *The Present Co.*, 141 B.R. 18, which was decided since the Penn Truck hearing, the Bankruptcy Court for the Western District of New York rejected a compromise because the debtor's insiders who had negotiated it refused to disclose to the objecting creditors any information about the causes of action the debtor was giving up. But that case is not ours, either. In *The Present Co.*, the court observed:

> No one supports this proposal other than the parties thereto (who are "insiders") and their counsel. The only other parties in interest appearing with regard to this compromise are the Creditors' Committee and certain individual members thereof, who are opposed to the compromise. The Funds [shareholders in the debtor] have refused to provide to the Creditors' Committee full disclosure of materials pertaining to the transactions that are here sought to be compromised and released.

141 B.R. at 23. Here, in contrast, as Judge Scholl explained, at least one major unsecured creditor did expressly approve the Penn Truck settlement.[7] Moreover, at least one party who stood to gain from it— the Teamsters union—did not.[8] The appellants claim to have a good deal of information about Penn Truck's potential lawsuits and what they would have been worth. This is not *The Present Co.*

In any event, the Eastern District of Pennsylvania is not bound by decisions of New York bankruptcy courts.

Most important, however, apart from any question of the correct legal level of scrutiny, is Judge Scholl's observation that higher scrutiny in *this* case was somewhat irrelevant. The real Penn Truck "insider" benefits in this deal—the full releases of the affiliates and of Cunningham—were not in the Penn Truck agreement at all, but in the affiliates agreement, which was independent of the bankruptcy court and which had already gone into effect. Judge Scholl saw the "insider aspect" in this compromise, but ruled it was significantly "diminished by the fact that that deal is already final."

■ Therefore, while higher scrutiny may well be appropriate for settlements negotiated by insiders, I agree with Judge Scholl that the circumstances of this case made the formal adoption of that new standard inappropriate. Because of the way the parties structured their settlement agreements, the one releasing Penn Truck's affiliates and insider principals was not actually before the court. It would have been odd, therefore, if not reversible error, for Judge Scholl to adopt a new test under Rule 9019(a) in a case in which it would not technically apply.

Finally, I note that notwithstanding Judge Scholl's appreciation that the affiliates agreement was a "done deal," it is not clear that he did *not* apply the higher scrutiny urged by the appellants to the Penn Truck Agreement. Both *Drexel* and *The Present Co.* claimed to apply the higher level of scrutiny, but held the proposed settlements were either "above" or "below" the "lowest point in the range of reasonableness." *Drexel* at 497; *The Present Co.* at 24. Judge Scholl clearly understood the insider nature of these agreements ("I realize it's like an arm's length transaction between the two-year-old and the mother"). Nevertheless he considered

---

7. American Insurance Group, with a potential claim of more than $7 million, stated its approval on the record.

8. The union did not pursue an appeal, however.

that factor "diminished" by the fact that the affiliates' releases was a "done deal."

Appellants do not contend there was any evidence, witness, or argument which Judge Scholl refused to hear on the basis of *Grant Broadcasting* which he would have heard under *Drexel* or *The Present Co.*. So even if I were to remand this case for "higher scrutiny," I am not sure what more Judge Scholl would do. Short of expressly finding "good faith" as in *Abbotts Dairies*, which I have already held does not apply, there is little more Judge Scholl could do to prove he rigorously scrutinized the settlement agreement *and* concluded that under the circumstances, it was fair and reasonable.

Judge Scholl did not err in using the lowest point in the range of reasonableness test to evaluate the Penn Truck settlement agreement.

B. *Whether this Compromise Fell Below the Lowest Point in the Range of Reasonableness*

Since Judge Scholl employed the correct level of scrutiny, the only question remaining is whether he abused his discretion in finding that the terms of this Penn Truck settlement agreement fell within the range of reasonable resolutions.

Appellants argue Judge Scholl could not have evaluated the reasonableness of the Penn Truck compromise because Penn Truck never bothered to find out or tell him how much its potential claims were worth. Appellants therefore contend Judge Scholl failed to satisfy even the elements of the test he purported to use, namely, the prob-

ability of success in litigation; the complexity, expense, and delay of litigation; and the paramount interests of the creditors. *Grant Broadcasting,* 71 B.R. at 395.

The Committee identifies Penn Truck's potential causes of action against Conrail as: 1) breach of contract, for premature and improper termination of the Terminal Services Agreements in February, 1992; 2) fraudulent conveyance, for forcing Penn Truck to finance its own acquisition following its sale in 1990; and 3) contribution to Penn Truck's potential withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").

The Committee argues Penn Truck did not seriously investigate the merits of litigating any of these claims so Judge Scholl could and did make only superficial, conclusory findings as to the reasonableness of the settlement. It points to Lang's testimony at the bankruptcy court hearing, in which he admitted that:

> The analysis [of these claims] was as simple as, do you litigate and incur expense and which would drag on over a long period of time. And in the meantime, the company ceases to operate. Or do you try to reach an agreement with Conrail which will allow the company to continue to operate. That was the analysis, there was no numbers.

■ Concededly, this analysis of the merits of potential litigation was sketchy. Moreover, Judge Scholl's own statements on the *Grant Broadcasting* factors were skeletal, at best.[9] However, I find that in approving the Penn Truck agreement,

9. He said, "... under the authority—I think all the traditional requirements are met, which are ... the probability of success in the litigation. I see a lot of, you know, question here, and there is big money involved. The difficulties to be encountered in collection. Well, that's an issue, I mean if the debtor won, I guess they would be able to collect against Conrail.

"Complexity of litigation, the expense, inconvenience, delay necessarily attending it, that would be substantial, you know, if we left the Conrail issue open. And the paramount interest of the creditors, and the proper deference to their reasonable views in the premises. Those are sort of strange words, but that's the traditional language.

"But that means basically you look at the creditors. And I do see more of a one body of creditors that has a problem with this, more than the large creditor body, which is often the case. In fact it was the case in the *Grant* case, and I still approved it there.

"So I really think that I will—under the law, have to grant it. You know, I do that with realizing that I haven't had a chance to look at the papers as carefully as I'd like to, you know, but I think we've really had good counsel pointing out a lot of the things that we should be looking at. And some of those things are worthy of consideration."

which he did only after six hours of direct and cross-examination, Judge Scholl did not abuse the discretion afforded him by Rule 9019(a). Lang also testified that Penn Truck was on the brink of demise and needed this settlement. Judge Scholl did not abuse his discretion in concluding that the danger of Penn Truck's immediate collapse outweighed the value of its potential claims against Conrail.

### 1. Conrail's Breach of Contract

The first potential claim involved Conrail's February, 1992, decision not to renew certain of its Terminal Services Agreements with Penn Truck. Appellants allege this decision caused Penn Truck's workers to strike, which prompted Conrail to terminate (although it only had the power to suspend) the Terminal Services Agreements. They conclude it was this termination which drove Penn Truck to the dire circumstances which forced it to accept Conrail's offer in the first place. Appellants would have Penn Truck sue for breach of contract.

Penn Truck and the Conrail Group argue that the Terminal Services Agreements were to expire within one week anyway, so any possible recoverable damages would have been minimal. Moreover, they argue that Penn Truck's workers struck just *before* Conrail decided not to renew the contracts, not after. These defenses suggest that at least, Penn Truck had a determined opponent, but perhaps also that Penn Truck had no claim at all.

### 2. Fraudulent Conveyance

The second cause of action is fraudulent conveyance: appellants claim that in selling Penn Truck originally, Conrail transferred Penn Truck's assets without fair consideration, rendering Penn Truck insolvent and thereby violating Pennsylvania laws against fraudulent conveyance. *See* 39 P.S.A. §§ 351–363.

■ At the bankruptcy court hearing, Lang testified extensively about the background and nature of Conrail's sale of Penn Truck (to Parent) in 1990. The sale involved cash as well as a promissory note, and was executed contemporaneously with approximately 20 trucking contracts intended to sustain Penn Truck's business. For almost two years, Penn Truck operated successfully under this arrangement. While I will not conduct a mini-trial of fraudulent conveyance allegations by Penn Truck against Conrail, I note that Penn Truck would have to prove Conrail left it with unreasonably small capital with which to conduct business, *see Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1063–64 (3d Cir.1992), and that no such allegation has been developed at all. Moreover, since evidently no creditors objected to the sale during the two years Penn Truck was in successful operation, laches may be asserted as a legitimate defense.

Finally, Conrail was obviously prepared to defend its positions vigorously and would have made any litigation by Penn Truck long and expensive.

### 3. Contribution for MPPAA Liability

Appellants claim the third potential cause of action against Conrail involves contribution under the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381, *et seq.* Penn Truck may still be responsible for contributing to the pensions of the employees it laid off following Conrail's decision not to renew its trucking contracts. Appellants claim Penn Truck's liability could amount to as much as $5.5 million, which they believe Conrail should share.

Appellees correctly point out that Penn Truck's potential liability under MPPAA was *reduced* when it accepted Conrail's agreements and stayed in business, since it was able to preserve many of its former jobs. By continuing in business, Penn Truck made it at least possible to continue to contribute to the pension funds and perhaps avoid liability altogether. In any event, it is far from clear that Conrail would have been obligated to share whatever liability Penn Truck might have borne. And again, there is no question that MPPAA litigation against Conrail would have been costly.

Clearly, Penn Truck's primary interest was to stay in business. It was losing

money fast, and its owners decided to sell its three potential lawsuits rather than litigate them as a defunct corporation. As Lang testified several times:

> In analyzing all these claims, we, number one, we didn't feel we had enough money to go out and litigate. Number two, that it was risky. And number three, that it would take a long period of time to do. And in the meantime, the company would fold. And we see—we saw this as an option of basically retaining—retaining the company, retaining jobs and continue to operate the business and earn a positive cash flow.

Judge Scholl, who heard six hours of such testimony and evaluated the credibility of these witnesses first-hand, made a reasonable decision in approving the Penn Truck agreement. There is no doubt appellants might have preferred another arrangement, and clearly Penn Truck *may* have done better to sue the Conrail Group instead of remaining in business with it. But under the circumstances, it was not unreasonable to choose this settlement. Judge Scholl found as much, and I will affirm.

### III. *Mootness*

Penn Truck and the Conrail Group moved to dismiss the whole appeal on the ground of mootness, arguing that after I denied the Committee's request for a stay, they went ahead and put their settlement agreement fully into effect. They claim that now, I could no longer grant effective relief by reversing Judge Scholl's order, so the appeal is moot.

I would not decide mootness on the basis of this record alone. Had I found Judge Scholl in error, I would remand the question to him to determine just what has developed between Penn Truck and the Conrail Group and what of that could be undone. *See Abbotts Dairies,* 788 F.2d at 151.

Nonetheless, since I will affirm Judge's Scholl's order, I can deny appellees' motion to dismiss the appeal as moot.