In re TEMPO TECHNOLOGY CORPO-
RATION, a/f/k/a Suprahards Manufac-
turing Corporation and Suprahards USA
Sales Corporation, Debtor.

Civil Action Nos. 95–438/95–478.

United States District Court,
D. Delaware.

June 25, 1996.

Laura Davis Jones and S. David Peress of
Young, Conaway, Stargatt & Taylor, Wil-
mington, DE (Laurence May and John H.
Drucker, Angel & Frankel, P.C., New York
City, of counsel), for debtor-appellee Tempo
Technology Corporation.

Mary J. Caloway of Duane, Morris &
Heckscher, Wilmington, DE (Ancela R. Nas-
tasi and Theodore L. Freedman, Kirkland &
Ellis, New York City, of counsel), for interve-
nor Tempo Acquisition Corporation.

Joanne B. Wills of Blank, Rome, Comisky
& McCauley, Wilmington, DE (Cory E.
Friedman, Townley & Updike, of counsel),
Crown Point, NY, for appellant Diamond
Abrasives Corporation.

David B. Stratton of Pepper, Hamilton &
Scheetz, Wilmington, DE (Cory E. Fried-
man, Townley & Updike, of counsel), Crown
Point, NY, for appellant Official Committee
of Unsecured Creditors.

Gregory M. Sleet, United States Attorney
for the District of Delaware, and Ellen M.
Slights, Assistant United States Attorney,
Wilmington, DE (Frank W. Hunger, Assis-
tant Attorney General, and Jack Kaufman,
Civil Division, Department of Justice, of
counsel), Washington, DC, for intervenor
United States of America.

## OPINION

MURRAY M. SCHWARTZ, Senior
District Judge.

## I. INTRODUCTION

On June 14, 1995, the United States Bank-
ruptcy Court for the District of Delaware

entered an order approving the sale of substantially of the assets of the Tempo Technology Corporation ("the Debtor") to the Tempo Acquisition Corporation ("TAC") pursuant to section 363(b)(1) of Title 11 of the United States Bankruptcy Code. Bankruptcy Record ("B.R.") 42. An unsecured creditor of the Debtor, Diamond Abrasives Corporation ("Diamond Abrasives"), timely filed this appeal of the bankruptcy court's order on June 22, 1995. B.R. 51. Four days later, the Official Unsecured Creditors' Committee of the Debtor filed a notice of appeal as well. B.R. 54.

The appeals were consolidated in this Court on July 27, 1995. Docket Item ("D.I.") 9. Appellants have framed the issues on appeal as the following:

1. Did the Bankruptcy court err when it entered an order approving the sale of substantially all of the assets of Tempo Technology Corporation to Tempo Acquisition Corporation pursuant to Sections 105(a) and 363(b), (f), and (m) of the United States Bankruptcy Code and authorizing the debtor to assume its obligations thereunder and to assume and assign certain of the debtors' [sic] executory contracts in connection therewith pursuant to 11 U.S.C. § 365?

2. Does Section 363(m) of the United States Bankruptcy Code preclude review of: (i) the Bankruptcy Court's order on appeal; and (ii) the validity of the sale of Tempo Technology Corporation's assets to Tempo Acquisition Corporation?

D.I. 2.

The Debtor then filed a motion to dismiss the bankruptcy appeals as moot under an applicable section of the Bankruptcy Code, 11 U.S.C. § 363(m). D.I. 13. The Debtor's motion to dismiss is based on the following grounds: (1) section 363(m) of the Bankruptcy Code requires dismissal of these appeals because Appellants failed to obtain a stay of the order approving sale, and (2) the sale of Debtor's assets to a good faith purchaser having been consummated, the Court cannot grant effective relief. D.I. 14.

Together on their brief, Diamond Abrasives and the Official Committee of Unsecured Creditors, (collectively, "Appellants") answered the Debtor's motion by alleging, *inter alia,* that 11 U.S.C. § 363(m) is unconstitutional as applied to the Appellants in this case. D.I. 21. Because Appellants implicated the constitutionality of a federal statute, the United States intervened in the appeal on December 27, 1995. D.I. 29. The purchaser of the Debtor's assets, TAC, was also granted leave to intervene on January 2, 1996. D.I. 27.

This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 158 and 1334. For the following reasons, the Court will dismiss this bankruptcy appeal as moot.

## II. PROCEDURAL BACKGROUND

On May 23, 1995, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. B.R. 1. At that time, according to the Debtor's president, John Hamann, the Debtor lacked sufficient cash with which to maintain even minimum business operations. Affidavit of John Hamann, B.R. 4 at ¶ 8. Hamann also stated that the Debtor corporation, one engaged in the manufacture of industrial diamonds, was worth more as a going concern as a opposed to a liquidated entity. *Id.* at ¶ 32.

Simultaneous with the filing of the Chapter 11 petition, the Debtor also moved the bankruptcy court for interim relief ("First Day Orders") designed to preserve the value of its assets. B.R. 3. The bankruptcy court granted the Debtor's First Day Orders, which included orders authorizing use of cash collateral, allowing Debtor-in-Possession ("DIP") financing, granting the DIP lender superpriority administrative expense and senior liens, scheduling a hearing date and time for approval of the asset purchase agreement which would provide for the sale of substantially all of the Debtor's assets, and scheduling an auction to entertain higher or better offers for the assets. B.R. 12, 13, 13A.[1]

---

**1.** Bankruptcy Record 13A appears on the bankruptcy docket sheet as a signed order approving the debtor's motion in Docket Item 13 (auction date, etc.). The original bankruptcy record contains an order that looks as if it was signed by the bankruptcy judge and then whited out. Offi-

A copy of the sale motion and the related memorandum of law were sent to the Debtor's 35 largest creditors, its secured creditors, and its landlords. Notice of the hearing on the sale motion and the auction for the Debtor's assets was mailed to all of the Debtor's creditors, including Diamond Abrasives, one of the Appellants in this appeal, on May 25, 1995. B.R. 16. Notice of the auction was also given in the National Edition of the Wall Street Journal. Transcript of Sale Hearing, B.R. 50 at 168.

Four objections to the sale motion were filed; by the time of the sale hearing, only Diamond Abrasives' objection had not been resolved. On June 13, 1995, at 10 a.m., the auction of the Debtor's assets was held at the offices of Young, Conaway, Stargatt, & Taylor. Although Diamond Abrasives was present, TAC, which was also the lender of the Debtor's interim financing, was the sole bidder.

At 3 p.m. that same day, and continuing into the next day, the bankruptcy court held a previously scheduled hearing to consider whether the sale of the Debtor's assets to TAC should be approved. In support of its sale motion, the Debtor offered evidence through the testimony of its president, John Hamann. Diamond Abrasives called no witnesses in support of its objection to the sale.

After all evidence had been presented, the bankruptcy court announced its decision from the bench approving the Debtor's sale motion. B.R. 50 at 170. The court rendered its ruling based on the standards for reviewing a proposed sale of assets under section 363 of the Bankruptcy Code enunciated in *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir.1986). B.R. 50 at 167–68. As articulated by the bankruptcy court, those standards were "adequate notice, good faith negotiations and a fair and reasonable price." *Id.* The court found that these requirements had been fulfilled in the conduct of the sale of the Debtor's assets to TAC.

At the close of the sale hearing, after the court announced its ruling, counsel for Diamond Abrasives had the following dialogue with the court:

Counsel for Diamond Abrasives: We would like to request a stay pending appeal.

The bankruptcy court: You may file the appropriate papers and I will schedule it.

B.R. 50 at 176.

Diamond Abrasives did not follow up on its oral stay request with a written motion. The court entered its order approving the sale that same day, June 14. B.R. 42. Later that day, the Debtor and TAC consummated the sale of Debtor's assets. D.I. 40 at 79.

Appellants first learned on June 20, 1995, the day that the Unsecured Creditors Committee was formed, that the sale of the Debtor's assets had been consummated on June 14th. *Id.* at 100. Because the sale and transfer of assets had already taken place, Appellants viewed the filing of an order to stay the sale as an exercise in futility. *Id.* They instead filed this appeal.

In its brief on the motion to dismiss the bankruptcy appeal, the Debtor has outlined events that have taken place since consummation of the sale. It discusses expenditures, employment decisions, contracts, and overall reliance by both the Debtor and TAC on the finality of the sale order. These events are supported with supplemental affidavits, information not reviewed by the bankruptcy court. *See* D.I. 14, Exhibit ("Exh.") A; D.I. 25, Exh. 1. Appellants will not stipulate to these facts pertaining to events occurring subsequent to the entry of the order now on appeal.

### III. DISCUSSION

#### A. Chapter 11 Reorganization and Section 363 of the Bankruptcy Code

Under Chapter 11 of the Bankruptcy Code, a debtor must ordinarily obtain court confirmation of a plan of reorganization before selling substantially all of its assets. *See* 11 U.S.C. §§ 1121–29. The Bankruptcy Code contains many procedural safeguards designed to protect the interests of the debtor's creditors, *e.g.* requirement that the debt-

---

cially, a signed order, as a matter of record, does not exist. From what transpired, it appears further proceedings were in accordance with the intended order.

or file disclosure statements, 11 U.S.C. § 1125; that the bankruptcy court hold a hearing regarding the adequacy of the disclosure, *id.;* that the court also hold a confirmation hearing, 11 U.S.C. § 1128, and confirm the plan of reorganization only if, *inter alia,* each creditor in a class of creditors accepts the plan or will receive value under the plan that is not less than the amount the creditor would receive if the debtor's estate were liquidated rather than reorganized, 11 U.S.C. § 1129(a)(7).

However, in some tension with these statutory provisions, section 363(b)(1) of the Bankruptcy Code permits a debtor to sell all or substantially all of its assets prior to confirmation of a reorganization plan, without the safeguards outlined above. After notice and a hearing, a debtor may sell its assets "other than in the ordinary course of business" if the sale is approved by the court. 11 U.S.C. § 363(b)(1). In addition, where a court approves a sale of the debtor's assets under section 363(b)(1),

> [t]he reversal or modification on appeal of an authorization under subsection (b) ... of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in *good faith,* whether or not such entity knew of the pendency of the appeal, unless such ... sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis supplied). Accordingly, courts have repeatedly held that a court-approved sale of property of a debtor to a good faith purchaser cannot be set aside absent a stay of that order. *See e.g., In re Mark Bell Furniture Warehouse,* 992 F.2d 7, 8 (1st Cir.1993); *In re Gilchrist,* 891 F.2d 559, 560 (5th Cir.1990); *In re Onouli–Kona Land Co.,* 846 F.2d 1170, 1172 (9th Cir.1988); *In re Sax,* 796 F.2d 994, 997 (7th Cir.1986); *In re The Charter Co.,* 829 F.2d 1054, 1056 (11th Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1488, 99 L.Ed.2d 715 (1988); *In re Exennium,* 715 F.2d 1401, 1403–04 (9th Cir. 1983); *see also In re Bel Air Assoc.,* 706 F.2d 301, 304 (10th Cir.1983) (construing predecessor section to section 363(m)). Thus, parties appealing the bankruptcy court's authorization of the sale should obtain a stay of that order. *See, e.g., Sax,* 796 F.2d at 997. Because the failure to obtain a stay pending appeal allows the sale to be completed, appellate courts have viewed this circumstance as precluding the courts from granting effective relief, thus mooting the appeal. *Onouli–Kona Land Co.,* 846 F.2d at 1172; *The Charter Co.,* 829 F.2d at 1056; *Sax,* 796 F.2d at 997.

In none of the above authority was the purchaser's good faith challenged on appeal; in the case *sub judice,* Appellants argue that the parties to the sale of the Debtor's assets did not act in good faith. D.I. 21 at 16. In cases where the purchaser's good faith was contested on appeal, courts have held that "[a]s indicated in § 363(m), a stay is not required to challenge a sale on the grounds that an entity did not purchase in good faith ..." *In re Ewell,* 958 F.2d 276, 281 (9th Cir.1992); *see also Sax,* 796 F.2d at 997 n. 4.; *Willemain v. Kivitz,* 764 F.2d 1019, 1024 (4th Cir.1985); *accord, Bel Air Assoc.,* 706 F.2d at 305 (by its own terms, the provision applies only where the buyer is a good faith purchaser); *see also* 2 *Collier on Bankruptcy* ¶ 363.13 at 363–46 (15th ed. 1995) ("purchasers are protected under section 363(m) from the effects of a reversal on appeal of the authorization to sell as long as the purchaser acted in good faith").

Similarly, in *Abbotts Dairies,* the Third Circuit Court of Appeals was confronted with a bankruptcy appeal in which the parties appealed a section 363(b)(1) order approving the sale of the debtor's assets. The appellants, as did their counterparts in the instant case, failed to obtain a stay pending appeal as outlined in section 363(m). Notwithstanding this failure to obtain a stay, the *Abbotts Dairies* appellants also asserted that a stay was not necessary because there was purportedly nothing in the record to support a finding that the purchaser acted in good faith. *Abbotts Dairies,* 788 F.2d at 147. The court agreed and remanded the action for an explicit finding regarding good faith. The court also explained that requiring such a finding "encourages finality of the bankruptcy court's judgments under section 363(b)(1), because it places prospective appel-

lants on notice of the need to obtain a stay pending appeal, or face dismissal for mootness pursuant to section 363(m), should the district court affirm the bankruptcy court's finding of good faith." *Id.* at 150. Thus, where the good faith of the purchaser is at issue, the district court is required to review the bankruptcy court's finding of good faith before dismissing any subsequent appeal as a moot under section 363(m). *Id.*

## B.  Good Faith

### 1)  Standards of Review

■ The question of whether TAC purchased the Debtor's assets in good faith involves a legal concept, good faith, with a factual component, *i.e.*, a determination of a mixed question of law and fact. *See id.* at 147. Where the Court is presented with such mixed questions, the appropriate standard must be applied to each legal or factual component. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir.1989). This Court must therefore exercise plenary review of the choice and application of the legal standard applied by the bankruptcy court. *Id.; Abbotts Dairies*, 788 F.2d at 147.

The lower court's factual finding are reviewed under a clearly erroneous standard. *See Sharon Steel Corp.*, 871 F.2d at 1221; Fed.R.Bankr.P. 8013 ("findings of fact shall not be set aside unless clearly erroneous"). A factual finding is clearly erroneous if it is "completely devoid of minimum evidentiary support displaying some hue of credibility or . . . bears no rational relationship to the supportive evidentiary data." *Fellheimer, Eichen and Braverman P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995). Findings may also be deemed clearly erroneous where there may be some evidence to support them, but the reviewing court is left with "the definite and firm conviction that a mistake has been made." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir.1992) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

Neither the Bankruptcy Code nor the Bankruptcy Rules define "good faith." In construing this phrase, courts have therefore borrowed from traditional equitable principles, holding that the concept of "good faith" speaks to the integrity of a party's conduct in the course of the bankruptcy sale proceedings. *Abbotts Dairies*, 788 F.2d at 147. A purchaser's good faith status at a bankruptcy sale would be destroyed by misconduct involving "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir.1978)).

### 2)  Appellants' Arguments

Appellants attack the bankruptcy court's factual finding that TAC was a good faith purchaser by arguing that the "manner in which [the Debtor] and TAC closed the Asset Sale is a plain indication of their lack of good faith." D.I. 21 at 16. Appellants contend that the Debtor waited for all of the pieces of its negotiations with TAC to fall into place before filing the bankruptcy petition, and that the First Day Orders had the effect of depreciating the value of the Debtor's assets and chilling any bidding at the auction. *Id.* at 15. Appellants assert that the DIP financing enjoyed by the Debtor locked up the Debtor's assets and weighed down the Debtor with debt. This, Appellants argue, constructively gave TAC a superpriority lien by insuring that TAC was the highest, if not the only bidder. *Id.* The Debtor and TAC are accused of contriving these tactics to take unfair advantage of the bidding process. *Id.* at 16.

Appellants also argue that there was no appraisal of the Debtor's assets to support the adequacy of the tendered consideration. *Id.* at 21. In short, Appellants assert that TAC was able to buy the Debtor's assets for "totally inadequate consideration." D.I. 40 at 104. Finally, Appellants point to the fact that Hamann, the former head of the Debtor, conducted the negotiations with the prospective purchaser and ultimately received a favorable employment package from TAC. *Id.* at 106. Appellants infer that Hamann's new status as a top executive in the TAC organization demonstrates collusion between the Debtor and the purchaser, constituting addi-

tional evidence of bad faith between Debtor and the purchaser.

### 3) The Record on Good Faith and the Bankruptcy Court's Findings

■ At the hearing on the motion to approve the asset purchase agreement providing for the sale of substantially all of the Debtor's assets, the bankruptcy court correctly announced that it would be applying the law of *Abbotts Dairies* to the facts before it. B.R. 50 at 167. The court noted, appropriately, that to approve a section 363(b)(1) sale of substantially all of the Debtor's assets, it had to make a "finding with respect to the 'good faith' of the purchaser." *See id.* at 150.

The only evidence presented at the hearing was the testimony of the Debtor's president, Hamann. Hamann testified that in January 1995, the Debtor's Board of Directors had approached CIBC Wood/Gundy ventures ("CIBC") and Clairvest Group, Inc. ("Clairvest"), proposing that these venture capitalists invest in the Debtor. D.I. 3, Exh. A at 43. According to Hamann's uncontroverted testimony, neither of these entities had ever been affiliated with the Debtor, its shareholders, or members of its Board of Directors. *Id.* at 42. In May, 1995, however, the prospective investors withdrew their offers for investment because the Debtor failed to meet certain operational objectives that CIBC had imposed as prerequisites. *Id.* at 43. The Debtor approached other investment sources in search of financing, including the state of New Jersey, without success. *Id.* at 44.

By late spring 1995, the Debtor faced a severe cash shortfall and had no readily available source of investment capital or loans. *Id.* at 43–45. In light of the grim financial outlook, the Debtor's Board of Directors contemplated closing the business down completely. *Id.* at 48. After consulting with bankruptcy counsel, the Board of Directors decided to pursue filing for bankruptcy protection under Chapter 11. *Id.* at 48–49. Twice the Debtor's management analyzed the liquidation value of the Debtor's assets and decided it would be in both the Debtor's and its creditors' best interests to try to sell the business as a going concern.

*Id.* at 52, 55–57. The Debtor's management advised its Board of Directors that in a liquidation, the assets to be sold would yield creditors approximately $1,500,000. *Id.* at 52. If the assets were sold in the aggregate as a going concern, the value obtained in the transaction would approximate twice that amount. *Id.* at 56–57.

The Debtor again contacted CIBC and Clairvest, this time proposing an interim financing package projected to carry the Debtor through the Chapter 11 process. *Id.* at 48–49. According to Hamann's unrebutted testimony, the negotiations were "pretty long, long hours, lots of points of debate and issue. Sometimes tempers flared. Pretty tough. It wasn't until the very end that [Hamann] was even convinced [there was] an agreement." *Id.* at 49. After repeated meetings spanning several weeks, CIBC and Clairvest ultimately agreed to form a new entity, TAC, and to purchase all of the Debtor's operating assets for $150,000 in cash, $3 million of TAC redeemable preferred shares, 10% of the common stock of TAC, and the assumption of the $500,000 of the Debtor's ordinary course administrative obligations and pre- and post-petition claims of the Debtor's employees who subsequently become employed by TAC. *Id.* at 55. The investors also offered to furnish a DIP financing loan which would give the Debtor $1 million in financing pending consummation of the sale. *Id.* The Debtor's Board of Directors unanimously approved the sale to TAC. *Id.* at 49. For his part, Hamann received no promise or inducement to support the asset purchase agreement; the investors were under no obligation to offer him employment by TAC. *Id.* at 64–65.

Both the Debtor and the purchasing entities agreed that the sale had to occur expeditiously. The Debtor estimated that it could not have survived as a going concern more than two or three days beyond the date it filed for bankruptcy. *Id.* at 62. According to Hamann, the Debtor was the first company that ever filed for bankruptcy in this particular industry, an industry known for its stability, reliability, and security. *Id.* at 66. Consequently, the Debtor expected that if it did not emerge from Chapter 11 quickly, the

resultant loss of vendor and customer confidence would further erode the value of the Debtor's business. *Id.* at 66–67.

Diamond Abrasives cross-examined Hamann at the sale hearing but did not put on any affirmative evidence. *Id.* at 68. Counsel for Diamond Abrasives elicited testimony concerning a discrepancy between Hamann's asset liquidation valuation of $1.5 million and certain financial statements assigning a book value of over $18 million to the same assets. *Id.* at 69. For example, the Debtor's balance sheet, generated January 1, 1995, showed a 'cost minus depreciation value' of $12 million for the Debtor's plant, property, and equipment. *Id.* at 72. However, by May 12, 1995, Hamann estimated the market value for these same items as only $1 million. *Id.* at 74. Hamann testified, however, that this difference in book value versus market value was warranted in light of the idiosyncracies of the Debtor's business and the liquidation process itself. Hamann explained that in his experience in managing other businesses that were either liquidated or "turned around," there is a vast differential in the market valuation of assets, especially inventory, of a thriving business versus one that is to be liquidated. *Id.* at 75. Much of the Debtor's inventory was specially ordered finished goods, not suitable to be sold on the open market in a liquidation sale. *Id.* at 79.

Similarly, much of the Debtor's equipment was customized to its processes and would not be very marketable through liquidation. *Id.* at 121. Hamann also explained that in his experience, the market value of accounts receivable is substantially decreased in a liquidation analysis. In the Debtor's estimation, if the company were to liquidate, many of its overseas accounts would elect not to pay anything because of difficulties involved in collection. *Id.* at 83. In short, only a portion of the book value of Debtor's assets would be recouped in a liquidation sale.

Hamann also testified that the Debtor contacted other prospective purchasers and tried to solicit a higher purchase price than the one offered by CIBC. B.R. 50 at 132–33. This was problematic because the abrasive diamond industry, worldwide, consists of only five to ten other entities—a paucity of prospective purchasers to drawn upon. B.R. 46 at 48. At least four other entities sent representatives to inspect the Debtor's operation and financial condition. *Id.* 133. However, no offers were forthcoming.

Before the section 363(b)(1) sale could be approved under Chapter 11, the Debtor was required to conduct an auction after giving three week's notice to the Debtor's thirty-five largest creditors, its secured creditors and its landlords and lessors. B.R. 13, 16, 17. Notice of the sale auction was also published in the national edition of the Wall Street Journal. B.R. 50 at 168. The bankruptcy court found that such notice was given well before the auction and four prospective buyers did conduct due diligence investigations. *Id.* Nevertheless, it is undisputed that no person or entity other than TAC bid at the auction. In the event that a competing bid had been entered, the $1 million DIP financing would have had to have been replaced by the competing bidder so that any loans advanced to the Debtor by CIBC and Clairvest could be paid back and the additional DIP funding would be available pending closing of the sale. In addition, the additional cash consideration of $150,000 and administrative expenses were factored into the calculation of the size of a competing bid sufficient to surpass the existing offer. Accordingly, an overbid price of $1.4 million was required at auction. The bankruptcy court found this overbid amount "not unreasonable." B.R. 50 at 170.

The bankruptcy court found that TAC was a good faith purchaser within the meaning of section 363(m) under *Abbotts Dairies.* The bankruptcy court found the following: TAC, the purchaser, was composed of venture capital companies not affiliated with the Debtor's management or board of directors. *Id.* at 169. In addition, the court found that TAC had originally explored the avenue of merely investing in the Debtor, but abandoned that proposal. *Id.* The Debtor then approached TAC with a proposal for TAC to buy the Debtor's assets. *Id.* The court found that negotiations between the two entities were "spirited with some anger and continued for a period of time." *Id.* The parties eventually agreed to a price of $3 million, payment

terms including cash, preferred and common stock, and an assumption of some of the Debtor's liabilities. *Id.*

The court also found that the auction procedures utilized were reasonable in light of the amount of financing provided to the Debtor by TAC. *Id.* at 170. The court's order approving the sale under section 363(b)(1) of the Debtor's assets to TAC explicitly found that the *Abbotts Dairies* standards had been met. *See* B.R. 42 at ¶¶ 8–10 (express findings of *inter alia*, adequate notice was given, TAC was a good faith purchaser of the assets, and the price paid for the assets was fair and reasonable). In addition, the court found that the expedited sale was necessary to preserve the value of the Debtor's assets, in order to protect the interests of not only the Debtor, but its creditors as well. *Id.* at ¶ 7. The bankruptcy court chose to analyze good faith and the reasonableness of the sale price together, as it correctly found the two issues "necessarily intertwined." *Id.* at 169. *See Abbotts Dairies,* 788 F.2d at 149 (if purchaser acted in good faith, then auction procedure sufficient to sustain a finding that the purchaser paid "value" for the estate).

The entire bankruptcy record supports the bankruptcy court's finding that TAC was a good faith purchaser. Hamann's unrebutted testimony regarding the negotiation of the sale of the Debtor's assets demonstrated arm's length negotiations between the purchaser and the Debtor. There was no evidence of fraud, collusion, or interested dealing between the players; Hamann was not promised any lucrative employment package for his part in the negotiations. In addition, it was uncontroverted that the purchase negotiations were fraught with debate, disagreement and at times seemed uncertain as to a positive outcome.

Moreover, there was no evidence that TAC colluded with the Debtor to attempt to take unfair advantage of other prospective bidders. Hamann's testimony demonstrated the Debtor's attempts to solicit interest from prospective purchasers other than TAC, albeit without success. Review of the initial emergency hearing in this matter also shows that the bankruptcy court considered that,

combined with the Debtor's cash crunch, the lack of other companies engaged in this industry weighed heavily in justifying an expeditious sale of the Debtor's assets as a going concern. B.R. 46 at 49–50. There was no evidence that any prospective purchasers regarded the auction terms as chilling their interest in bidding. Without a sizable pool of potential buyers, with only one buyer willing to negotiate terms of a purchase, and the Debtor's severe cash flow predicament, the bankruptcy court did not err when it approved the sale under 363(b)(1) of the Bankruptcy Code.

In sum, the record shows that the bankruptcy court applied the proper legal standard for good faith under *Abbotts Dairies.* The is nothing in the record to demonstrate that the bankruptcy court's factual finding of good faith bears no rational relationship to the supportive evidentiary data or that the finding is completely devoid of minimum evidentiary support displaying some hue of credibility. *See Fellheimer, Eichen and Braverman P.C.,* 57 F.3d at 1223. The Court will therefore affirm the bankruptcy court's finding that the purchaser and the Debtor consummated the sale in good faith.

## C. Mootness of the Appeal under 11 U.S.C. § 363(m)

The Debtor and TAC both urge that because the purchase was conducted in good faith, and that because Appellants failed to obtain a stay of the order approving the sale of assets, the appeal is moot because there is no effective relief that can be granted. One year has elapsed and, absent a stay of the sale order, the Debtor's assets have changed hands, and the Debtor and TAC have relied upon the order as final. The Debtor has submitted affidavits in support of its position that TAC has invested substantial capital into the Debtor's business, that new contracts and leases have been entered into, proprietary information has been assigned to TAC, and a new business plan has been implemented. *See, e.g.,* Affidavit of Robi Blumenstein, D.I. 14, Exh. A. Appellants have refused to stipulate to the facts contained in the affidavits; they counter that the case is not automatically moot under 363(m)

merely because of the failure to obtain a stay, and that there is effective relief that can be granted.

Appellants argue for the application of a recent, in banc Third Circuit appellate court decision for the proposition that failure to obtain a stay of a bankruptcy order does not necessarily moot a bankruptcy appeal of the order. In *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552 (3d Cir.1994) (in banc), the court discussed 11 U.S.C. § 364(e), which contains language similar to section 363(m). *Id.* at 559–60. Section 364(e) provides in relevant part that the

> reversal or modification on appeal of an authorization ... to obtain credit or incur debt, ... does not affect the validity of any debt so incurred, ... to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt ... were stayed pending appeal.

11 U.S.C. § 364(e). In construing this provision, the court found that because the statute plainly allows the consequences of "reversal or modification" of an order when the order has not been stayed pending appeal, one could not conclude that the statute in itself requires that an appeal be dismissed if a stay is not obtained. *Id.* at 559. Stated differently, the court posited that no one could "explain how there can be a 'reversal or modification' of an order, if the appeal from the order has been dismissed." *Id.* Therefore, the court concluded that failure to obtain a stay of a bankruptcy order does not warrant an *automatic* dismissal of an appeal of that order. *Id.* at 560.

In *Swedeland*, the Swedeland Development Group filed for Chapter 11 bankruptcy protection while developing a golf course and residential real estate project. *Swedeland*, 16 F.3d at 556. Pre-petition, the Carteret Federal Savings Bank held the first mortgage on the realty with its loan to Swedeland for acquisition and development financing. *Id.* Post-petition, the bankruptcy court subordinated Carteret's lien to that of two other lenders, Haylex and First Fidelity, who were authorized superpriority lienholder status by court order. *Id.* at 557. Though Carteret appealed from that order, it did not seek a stay under 11 U.S.C. § 364(e) pending the appeal. *Id.*

Section 363(m) contains analogous language:

> [t]he reversal or modification on appeal of an authorization under subsection (b) ... of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such ... sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). At first blush, it seems plausible that this statute must be similarly construed, *i.e.*, the mere failure to obtain a stay will not automatically preclude appellate review. Further examination of the different policies underpinning these two statutes, however, reveal that the idiosyncracies of each case dictate mootness *vel non*.

Even though the *Swedeland* court concluded that the statute did not allow for automatic dismissal for mootness for failure to obtain a stay under section 364(e), the court also hinged its mootness analysis on consideration of whether the appellant could obtain "*some form* of meaningful relief." *Id.* at 560. The in banc court emphasized Supreme Court precedent that "an appeal is not to be dismissed as moot merely because a court cannot restore the parties to the *status quo ante*. Rather, when a court can fashion 'some form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." *Id.* (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992)). The court then looked to whether the loans at issue had been completely disbursed, and acknowledged that to the extent that they were, the validity of the debt incurred and the superpriority lien securing that debt could not be affected. *Swedeland*, 16 F.3d at 560. With respect to monies not yet disbursed, the court found that the lender should be accorded superpriority status for funds the lender has retained. *Id.* at 561. Therefore, some effective relief

could in fact be granted as to the undisbursed financing. *Id.* at 560–61.

Significantly, the *Swedeland* court looked to section 363(m) and opined that the inquiry into fashioning effective relief depends on the circumstances of each case. *Id.* at 560 n. 6. The court commented that "[o]bviously it might be more difficult to fashion effective relief in the case of a completed and unassailable sale ... of property than in a [*Swedeland* type] case involving a loan in which the transaction is partially executory." *Id.* Other Third Circuit precedent is consistent with this notion, *i.e.,* that where there has been a completed sale in which assets have changed hands, no effective relief can be granted. In *Abbotts Dairies,* the appellees argued that the appeal should be dismissed as moot pursuant to section 363(m), as in the instant case. *Abbotts Dairies,* 788 F.2d at 147. The *Abbotts Dairies* record, however, was devoid of any finding as to the good faith of the purchaser in a section 363(b) bankruptcy sale. The Third Circuit appellate court remanded for further fact finding on the issue of good faith of the purchaser. In so doing, the court instructed that under the Bankruptcy Code provisions governing the sale of assets, the requirement of good faith is paramount in ensuring that section 363 will not be employed to circumvent the usual creditor protections of Chapter 11. *Id.* at 150. However, satisfaction of the good faith requirement is key to the finality of the bankruptcy court's order approving such a sale; prospective appellants are placed on notice under section 363(m) of "the need to obtain a stay pending appeal, or face dismissal for mootness ... should the district court affirm the bankruptcy court's finding of good faith." *Id.*

Other circuits have also similarly found that absent a stay of the order approving a section 363 sale to a good faith purchaser, the appellate court is prevented from granting effective relief, thus mooting the appeal. *Onouli–Kona Land Co.,* 846 F.2d at 1172; *The Charter Co.,* 829 F.2d at 1056; *Sax,* 796 F.2d at 997. This "reflects the salutary policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *Abbotts Dairies,* 788 F.2d at 147 (citations omitted). Finality and reliability of judicially-approved bankruptcy sales serve to enhance the value of assets sold in bankruptcy. *Mark Bell Furniture Warehouse,* 992 F.2d at 8.

A second, complementary policy underlying section 363 involves a court's general jurisdictional bar from deciding cases in which it cannot provide a remedy. *In re Stadium Management,* 895 F.2d 845, 848 (1st Cir.1990).[2] Even if a dispute would be decided in favor of the appellant, an appeal must be dismissed as moot when an event occurs, such as a completed section 363(b) sale, that prevents an appellate court from granting any effective relief. *Abbotts Dairies,* 788 F.2d at 150 n. 6.

It is true that a court may not dismiss an appeal just because the *status quo ante* cannot be restored. *Swedeland,* 16 F.3d at 559–60; *cf. In re B. Cohen & Sons Caterers, Inc.,* 147 B.R. 369, 373 (Bankr.E.D.Pa.1992) (cataloguing factors to be considered in assessing whether effective relief could be granted). However, where an appellate court would provide relief by vacating a sale of property, as in this case, such relief is impracticable. *See In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 267 (3d Cir.1991) (dictum). Other than wholesale reversal of the sale order, Appellants have failed to offer any practical or realistic suggestions as to how appropriate relief could be fashioned in light of the Debtor's and TAC's reliance on the approval of the asset sale.[3] Citing *Abbotts Dairies* for

---

**2.** A few courts have recognized two exceptions in which failure to obtain a stay under section 363(m) will not render an appeal moot: where real property has been sold subject to a right of redemption, and where state law might allow the transaction to be set aside. *See, e.g., Mann v. ADI Invs.,* 907 F.2d 923 (9th Cir.1990); *West End Assocs. v. Sea Green Equities,* 166 B.R. 572 (D.N.J.1994). Appellants have not advanced arguments under either of these exceptions in this case.

**3.** Because Appellants' submission is bereft of any suggestion of workable or practical effective relief, the appellee's supplemental contested but unrebutted affidavits have not been considered by the Court. The Court takes no position on

the proposition that a bankruptcy court is a court of equity and could rectify any unfairness in the administration of the bankrupt estate, 788 F.2d at 151, Appellants argue that TAC was not an innocent third party because it deliberately maneuvered the timing of the purchase agreement and consummation of the sale. However, the Court has found that TAC acted in good faith. It follows that there are no equities weighing against this innocent, third-party purchaser. In addition, although the Unsecured Creditors' Committee was not formed until after the sale was completed, its rights and position are unaffected whether or not this appeal is dismissed as moot. D.I. 40 at 150. The other third party creditors not currently before this Court as individual parties withdrew their objections to the sale before the sale was consummated. When the competing equities are viewed in light of the failure of Appellants' counsel to seek a stay, the completion of and reliance upon the sale transaction by the Debtor and TAC, and considerations of other parties not heard in this proceeding, Appellants have not persuasively advanced any arguments as to how effective relief could be granted at this point.

Appellants also argue that if the Court dismisses this bankruptcy appeal as moot under section 363(m), then that statute is unconstitutional as applied in this case because it effectively precludes Appellants from obtaining Article III court review. In other words, if this appeal is found to be moot, Appellants will be foreclosed from having their appeal heard on the merits. Appellants' protestations, however, can be disposed of without reaching a constitutional question. *See Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision").

28 U.S.C. § 158 provides for appellate review by the district court of bankruptcy court orders. Appellants have availed themselves of this review by filing the instant appeal. First, they have asserted that the asset sale was not consummated in good faith, and this Court has fully reviewed that finding below on the merits. Second, if section 363(m) and the mootness doctrine result in dismissal of this appeal, it is only because effective relief is foreclosed by Appellants declining, for whatever reason, to formally apply for a stay of the order below. Although the bankruptcy court explicitly invited counsel to submit a written motion for a stay, none was forthcoming. Appellants could have also applied for a stay to this Court pursuant to Bankruptcy Rule 8005 upon a showing as to why the relief "was not obtained from the bankruptcy judge." Fed.Bankr.R. 8005.[4] However, they did not do so.

By not seeking a stay allowing them to preserve their position on appeal, Appellants must now live with the consequences of their counsel's behavior. When pressed at oral argument for a reason why he did not follow up on their oral request for a stay, counsel could not provide a reason. However, as one court has eloquently stated,

> The request for a stay of the sale order is not simply another formality to be ob-

---

whether it would have been appropriate to factor them into its analysis.

4. The rule in its entirety provides:

A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest. A motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge. The district court or the bankruptcy appellate panel may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court. When an appeal is taken by a trustee, a bond or other appropriate security may be required, but when an appeal is taken by the United States or an officer or agency thereof or by direction of any department of the government of the United States a bond or other security shall not be required.
Fed.Bankr.R. 8005.

served in perfecting an appeal. A stay serves to maintain the status quo pending appeal, thereby preserving the ability of the reviewing court to offer a remedy and holding at bay the reliance interests in the judgment that otherwise militate against reversal of the sale.... Once the sale has gone forward, the positions of the interested parties have changed, and even if it may yet be *possible* to undo the transaction, the court is faced with the unwelcome prospect of 'unscrambling the egg.'

*In re CGI Indus., Inc.*, 27 F.3d 296, 299 (7th Cir.1994) (citations omitted). Once the bankruptcy court approved the sale over the objection of counsel for Appellants, it was incumbent on counsel to "act with dispatch" in seeking a stay. *See id.* at 300; *cf. In re Truck Drivers & Helpers Local Union # 107*, 888 F.2d 293, 297 (3d Cir.1989) (appellant should "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from").

The Court is well aware that the bankruptcy court entered its order approving the sale of the Debtor's assets following completion of the hearing on the sale motion, and that the parties acted immediately to close the sale. However, Diamond Abrasives did not present witnesses or testimony at the sale hearing; counsel acknowledges that it occurred to him that his client might not prevail. D.I. 40 at 77. That notwithstanding, counsel for Diamond Abrasives,[5] who is experienced bankruptcy counsel, *id.*, chose not to come prepared with papers to file an emergency stay motion, ignoring the fact that in 1991, Congress amended Bankruptcy Rule 7062 to permit parties to section 363(b)(1) sales to close immediately upon the entry of the sale order. This amendment excepted orders authorizing section 363(b)(1) sales from the general ten day stay of all federal court orders under Fed.R.Civ.P. 62(a). Surely, bankruptcy counsel was aware that "[a] discretionary stay must be obtained in those cases involving exceptions to the automatic 10–day stay of Federal Rule 62(a). Otherwise, the objec-

tion would be mooted and an appeal will become fruitless if the sale is held...." W. Norton Jr., *Norton Bankruptcy Law and Practice 2d: Bankruptcy Rules* (1994), p. 507.

Further, Diamond Abrasives never followed up on its oral request for a stay. Although Diamond Abrasives argues that it did not seek a written stay because the sale was completed so quickly, Diamond Abrasives did not know of the consummated sale transaction until six days after the sale took place. During the time period when it had no knowledge that the sale had been transacted, Diamond Abrasives did not bother to file a written stay motion as explicitly required by the bankruptcy court. In light of prevailing precedent, the amended Bankruptcy Rule 7062, and the direction of the bankruptcy court itself, Diamond Abrasives should have availed itself of the procedural mechanisms afforded by the Bankruptcy Code on its ultimate quest of appealing the merits of the bankruptcy court's order. In short, although further review is precluded because this appeal is moot, it is moot because the counsel sat on his clients' rights, not because the statute, as applied, is unconstitutional.

## IV. CONCLUSION

For the above stated reasons, the Court affirms the bankruptcy court's finding of good faith below, and holds that this appeal is moot under section 363(m) of the Bankruptcy Code because no effective relief can be granted. The Court will therefore dismiss this appeal. An appropriate order shall be entered.

---

5. Counsel representing Diamond Abrasives at the bankruptcy court's hearing on the sale motion represents both Diamond Abrasives and the Official Committee of Unsecured Creditors in this appeal. D.I. 40 at 4.