**In re MARVEL ENTERTAINMENT GROUP, INC.; The Asher Candy Company; Fleer Corp.; Frank H. Fleer Corp.; Heroes World Distribution, Inc.; Malibu Comics Entertainment, Inc.; Marvel Characters, Inc.; Marvel Direct Marketing, Inc.; and Skybox International, Inc., Debtors.**

**Civ.A. No. 97–638–RRM.**

United States District Court,
D. Delaware.

June 25, 1998.

Collins J. Seitz, Karen C. Bifferato, Connolly, Bove, Lodge & Hutz, Wilmington, DE; Michael R. Griffinger, Frank J. Vecchione, Karen A. Giannelli, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for John J. Gibbons, Chapter 11 Trustee.

Steven Kortanek, Phillips Goldman & Spence, Wilmington, DE; Edward S. Weisfelner, Bari J. Mattes, Berlack, Israels & Liberman, L.L.P., New York City, for Standby Purchasers.

Thomas L. Ambro, Mark D. Collins, Daniel J. DeFranceschi, Margaret H. Morgan, Richards, Layton & Finger, Wilmington, DE; Chaim J. Fortgang, Douglas S. Liebhafsky, Amy R. Wolf, Douglas K. Mayer, David C. Bryan, Wachtell, Lipton, Rosen & Katz, New York City, for Secured Lenders.

Jeffrey C. Wisler, Williams, Hershman & Wisler, P.A., Wilmington, DE; Richard S. Toder, Andrew D. Gottfried, Zalkin, Rodin & Goodman, L.L.P., New York City, for Chase Manhattan Bank, as DIP Agent.

David B. Stratton, David M. Fournier, Pepper, Hamilton & Scheetz, L.L.P., Wilmington, DE; Lawrence C. Ashby, Ashby & Geddes, Wilmington, DE; Lawrence Mittman, Douglas L. Furth, David Fleischer, Madlyn Gleich Primoff, Battle Fowler, L.L.P., New York City, for Toy Biz, Inc.

Teresa Currier, Adam G. Landis, Duane, Morris & Heckscher, L.L.P., Wilmington, DE; Gary M. Schildhorn, Steven D. Usdin, Gary D. Bressler, Leon R. Barson, Adelman, Lavine Gold and Levin, Philadelphia, PA, for Official Committee of Equity Security Holders.

Norman L. Pernick, Saul, Ewing, Remick & Saul, Wilmington, DE, for Marvel Holdings.

Joanne Wills, David S. Eagle, Klehr, Harrison, Harvey Branzburg & Ellers, L.L.P., Wilmington, DE; James E. Spiotto, Ann Acker, Franklin H. Top, III, Timothy T. Finley, Chapman & Cutler, Chicago, IL, for LaSalle National Bank as Indenture Trustee.

Michael B. Joseph, Theodore J. Tacconelli, Ferry & Joseph, Wilmington, DE; Tonny K. Ho, Francis J. Menton, Jr., Elvin Esteves, Catherine E. Larocca, Willkie Farr & Gallagher, New York City, for Official Committee of Unsecured Creditors.

Patricia A. Staiano, Frederick J. Baker, John D. McLaughlin, Jr., Office of U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

McKELVIE, District Judge.

This is a bankruptcy case. On December 27, 1996, Marvel Entertainment Group, Inc. ("Marvel") and certain of its subsidiaries (collectively "the Debtors") filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code ("the Code") in the United States Bankruptcy Court for the District of Delaware. This court has withdrawn the reference to the bankruptcy court and entered an order authorizing appointment of a trustee.

On May 12, 1998, the trustee, John J. Gibbons, moved for an order approving a stipulation and agreement of settlement ("the Settlement") that he has reached with other parties involved in this proceeding, including Toy Biz, Inc. and secured lenders to the Debtors. Several other interested parties, including the Official Equity Security Holders' Committee ("the Equity Committee"), the Official Committee of Unsecured Creditors ("the Creditors' Committee") and LaSalle National Bank ("LaSalle") object to the motion. This is the court's decision on the motion.

## I. FACTUAL BACKGROUND

On December 27, 1996, the Debtors filed voluntary petitions for relief under Chapter 11 of the Code. At that time, three holding companies ("the Holding Companies") owned and controlled 80% of Marvel's common stock. Ronald O. Perelman owned the Holding Companies and a portion of the balance of Marvel's common stock. On the same day that the debtors filed their petitions, the Holding Companies also filed petitions for relief.

During 1993 and 1994, the Holding Companies had issued $894 million in bonds in three separate indentures, and secured the bonds with Marvel stock. The Holding Companies defaulted under the indentures, and on June 20, 1997, a group of bondholders voted the pledged shares to replace Marvel's board of directors. See In re Marvel Entertainment Group, Inc., 209 B.R. 832 (D.Del.1997) (vacating the bankruptcy court's temporary restraining order barring the bondholders from voting the pledged shares). High River Limited Partnership, indirectly owned by Carl C. Icahn, and Westgate International, L.P. (collectively "the Icahn interests") are key members of this bondholders group. LaSalle is the trustee for the bondholders under the indentures.

Led by the new board, the Debtors proposed and discussed several settlement agreements with its pre-petition secured lenders ("the Secured Lenders") and post-petition debtor-in-possession lenders. Chase Manhattan Bank ("Chase") was a lead party in these negotiations. The parties were not able to finalize any of these proposed agreements.

The new board also attempted to replace the board of a company called Toy Biz, Inc. Marvel had formed Toy Biz with two men, Avi Arad and Isaac Perlmutter, in 1993. Marvel contributed a license for all of its comic book characters and received 46% of Toy Biz's common stock. In 1995, Perelman, Arad and Perlmutter offered Toy Biz's common stock to the public. As part of the transaction, the three principals agreed to convert Marvel's Toy Biz stock to Class B shares, each share of which was entitled to ten votes. Thus, at the time that the bondholders took over Marvel, Marvel owned over 30% of Toy Biz's common stock, but controlled over 70% of the voting power in Toy Biz. On June 22, 1997, the Debtors' new board attempted to fill empty slots on the Toy Biz board with its own candidates. At the same time, Perlmutter and Arad installed different individuals in those slots. Arad and Perlmutter relied upon a provision in the Toy Biz Stockholders Agreement, which provided that Marvel's Class B shares would convert to Class A shares (with one vote per share) if Perelman were to cease to control Marvel.

On June 23, 1997, Perlmutter and Arad filed an adversary proceeding in the bankruptcy court, seeking to have the incumbent board and the individuals that Perlmutter and Arad had selected be declared the duly elected board. The Debtors moved to dismiss the proceeding. The Debtors disagreed with Perlmutter and Arad as to whether Toy Biz's Stockholders Agreement was controlling, and claimed that the individuals they had selected were members of the duly elected board. While Perlmutter and Arad's group maintained control over Toy Biz, the Debtors began challenging the validity of their actions.

On October 30, 1997, the Debtors filed a civil action in this court ("the Perelman litigation"). The Debtors' complaint alleges that while Perelman was in control of Marvel, he conspired with Chase and others to license valuable Marvel assets to Toy Biz at a substantial discount. The Debtors named as defendants, among others, Chase, the other Secured Lenders, Perelman, and Toy Biz.

On November 17, 1997, the court withdrew the reference of the Debtors' bankruptcy cases. As the parties were still disputing whether Toy Biz's board was duly elected, the court set up a briefing schedule to resolve the issue, in the context of a motion by Toy Biz for summary judgment in the adversary proceeding.

On November 21, 1997, Toy Biz and the Secured Lenders filed a joint plan of reorganization for the Debtors, and also filed a proposed disclosure statement for the joint plan. In general terms, the proposed plan involves a merger between Toy Biz and Marvel to form a new company called Newco. Newco would then distribute its shares among the various parties in interest. The Icahn interests, among others, objected to the disclosure statement on the ground that the plan was invalid, since it was being proposed by a Toy Biz board with no authority to act.

On December 12, 1997, this court authorized the appointment of a trustee for the Debtors. The court explained the reasons for the appointment in an opinion dated December 16, 1997. *In re Marvel*, C.A. No. 97–638–RRM, 1998 WL 181084 (D.Del. Dec. 16, 1997), *aff'd* 140 F.3d 463 (3d Cir.1998). In its opinion, the court concluded that cause existed, pursuant to 11 U.S.C. § 1104(a)(1), because the parties were "sharply divided on many issues." *Id.* at 11. The court explained that a trustee would facilitate the selection of a reorganization plan. The court noted that, as part of the job, the trustee would have to independently evaluate the merits of the Perelman litigation, to "determine whether it is in Marvel's interest to pursue some, all, or none of those claims." *Id.* at 12. The United States Trustee for the District of Delaware subsequently selected John J. Gibbons as trustee. On December 22, 1997, the court approved the appointment.

On February 13, 1998, the court held a hearing on the adequacy of the disclosure statement that Toy Biz and the Secured Lenders had offered in connection with their proposed plan of reorganization. On February 20, 1998, the court approved the disclosure statement, and scheduled a hearing to consider confirmation of the plan for May 4–5, 1998.

On March 11, 1998, Toy Biz and the Secured Lenders reached an agreement with the unsecured creditors. The parties agreed to amend the reorganization plan so that under the new plan ("the Second Amended Plan") the unsecured creditors would receive between 1 million and 1.75 million warrants. The warrants would have a strike price of $17.25 per share, and would mature 4 years from the date of issuance. The unsecured creditors would also receive up to $8 million in cash and 30% of the proceeds derived from the Perelman litigation. Finally, the agreement included an "MFN clause," which provided that "[i]n no event shall the Marvel Equity Committee receive warrants with more favorable terms (i.e. exercise price, maturity) than warrants provided to the Allowed Unsecured Claims." The Creditors Committee agreed to withdraw its opposition to Toy Biz's summary judgment motion in the adversary proceeding, and to support the Second Amended Plan. The court approved the disclosure statement for the Second Amended Plan on March 13, 1998.

On March 12, 1998, the presented oral argument on Toy Biz's motion for summary judgment in the adversary proceeding. On March 30, 1998, the court granted summary judgment to Toy Biz. *See In re Marvel Entertainment Group Inc., Toy Biz, Inc. v. Marvel Characters, Inc.*, 97–648–RRM (Opinion, March 30, 1998). The court found that Marvel's majority voting rights terminated when the bondholders replaced Perelman on the Marvel board. The court found that the incumbent Toy Biz board, plus the individuals that Arad and Perlmutter had installed to fill empty slots, constituted the duly elected board, and that this board was authorized to act on behalf of Toy Biz.

The Equity Committee, the Icahn interests and Gibbons each appealed the court's order granting summary judgment to Toy Biz. The Equity Committee also filed a motion in the Court of Appeals for the Third Circuit for an expedited appeal. On April 13, 1998, the Court of Appeals entered an order granting the motion for an expedited appeal. The court also, *sua sponte*, ordered that "the

effectiveness of the summary judgment order of March 30, 1998 is stayed, as is the confirmation hearing scheduled on May 4 and May 5 to consider the Toy Biz plan of reorganization."

On May 12, 1998, Gibbons filed a motion for an order approving a stipulation and agreement he has reached with Toy Biz, the Secured Lenders, and others. In the Settlement, Gibbons agrees to dismiss with prejudice the claims in the Perelman litigation against, among others, Chase, the other Secured Lenders, Arad, Perlmutter, and Toy Biz. Gibbons also agrees to support confirmation and consummation of Toy Biz's proposed reorganization plan, with some changes. Specifically, the amended plan ("the Third Amended Plan") would distribute 12 million warrants, in three series, to holders of Marvel equity. These three series consist of: (a) 4 million warrants exercisable at $12 per share for 6 months; (b) 3 million warrants for Convertible Preferred Stock (convertible into 3.12 million shares of common stock) exercisable at $10.65 per share for six months; and (c) 5 million warrants exercisable at $18.50 per share for four years. The Third Amended Plan would also give equity holders 70% of the proceeds derived from the Perelman litigation, as brought against remaining defendants. The Settlement is contingent upon the confirmation and consummation of Toy Biz's reorganization plan.

Several parties filed objections to the Settlement, including the Creditors Committee, the Equity Committee, the Icahn interests, and LaSalle. The Creditors Committee claims that the Settlement's warrants for equity holders violate the MFN clause of their agreement with the plan proponents, and also dilute the value of the warrants that the unsecured creditors are to receive under the plan. The Equity Committee and the Icahn interests complain that the Settlement improperly ties the hands of Gibbons, since it restricts his ability to negotiate other possible deals for Marvel. Each of the objecting parties expresses concern about the broad scope of the releases in the Settlement. Finally, each objecting party claims that the Settlement is, for all intents and purposes, a

reorganization plan (a *"sub rosa* plan"), and thus that the Settlement should not go through before the court hears the parties on all confirmation issues.

In a May 15, 1998 hearing in this court, Gibbons asked the court to approve the Settlement. Gibbons indicated that this approval would then render the Toy Biz governance issue moot, and that upon approval, he would immediately file a motion before the Third Circuit requesting a lift of the order staying the confirmation hearing and also requesting a stay of the appeal of the summary judgment order. This court indicated to Gibbons that the stay order should be lifted before it would consider the motion to approve the Settlement.

Gibbons subsequently filed a motion in the Third Circuit to vacate its April 13, 1998 order staying the confirmation hearing. On May 29, 1998, the Third Circuit lifted its stay, so that this court might "(a) ... consider and resolve the pending motion of the trustee for approval of his proposed settlement, and (b) if that motion is granted, ... consider and resolve an application for confirmation of the plan of reorganization contemplated by that settlement."

On June 12, 1998, the court held a hearing to consider Gibbons's motion for approval of the Settlement. Gibbons first offered testimony from William Peluchiwski, a senior vice president at the investment banking firm of Houlihan Lokey Howard & Zukin. Peluchiwski testified about the economic benefit of the proposed settlement to the various constituencies. He testified that the Third Amended Plan offers almost the same distribution to unsecured creditors as the Second Amended Plan did. He estimated that unsecured creditors may lose some value to the warrants they are to receive under the plan, but that this lost value would at most amount to $140,000. He noted that Newco stock would probably begin trading at some value less than $10 per share, and thus concluded that the warrants exercisable at $12 per share for six months would probably not have any value. Peluchiwski also testified that the Third Amended Plan offers common stockholders between $5.6 and $14.9 million more than the Second Amended Plan. He

testified that he had estimated the value to Marvel of voting control of Toy Biz to be between $2.3 and $12.5 million.

Finally, Peluchiwski testified about his assistance to Gibbons in soliciting outside bids for the Debtors. He testified that while several companies had shown interest in the company, no party other than the Icahn interests had made an actual offer. Peluchiwski indicated that Icahn had made an offer as recently as May 26, 1998. He testified that this offer provided better recoveries for some constituencies, and worse recoveries for others. He testified that he was unsure whether the Icahn interests actually intended to complete the deal they were proposing. He concluded, after financial analysis of the Third Amended Plan and the alternatives available to Gibbons, that the Settlement is financially in the best interests of the estate.

Gibbons testified at the hearing about the terms of the settlement. He explained that he had investigated the complaint filed in the Perelman litigation on many occasions, and had attempted to evaluate the claims listed in the complaint. He testified that many of the claims would face "problems." For instance, be believed that several of the claims would probably be barred by the applicable statute of limitations. He also indicated that these claims might be not survive analysis under the "business judgment rule" standard that is the law in Delaware. Gibbons testified that he had attempted to determine whether there was a strong factual basis for the claims in the complaint, but that he had not learned anything that had changed his analysis of the claims. He concluded that "[e]very count [against the defendants he proposed to release] involves a fairly tough lawsuit."

Gibbons also testified that he faced some time pressure in this case. He indicated that he was concerned about the Secured Lenders foreclosing on their assets and liquidating the company, if the parties did not consummate the proposed reorganization plan. He also testified that he wanted to take advantage of the leverage he had in negotiations while the Toy Biz governance issue was still on appeal. He suggested that, if the Third Circuit were to uphold this court's finding that Marvel had lost its majority rights in Toy Biz, his position would be weaker than it is while he still holds the possibility of winning on appeal and maintaining voting control over Toy Biz. Finally, he noted that, even if he were to win on appeal and obtain voting control over Toy Biz, he would not consider that right to be very valuable, since he would support the Toy Biz plan anyway. In other words, he believed that the best option for the Debtors—no matter who controlled Toy Biz—was the reorganization plan proposed by Toy Biz. Thus, even if Gibbons were to control Toy Biz through increased voting power at Marvel, the ultimate result for Marvel would be the same.

On cross-examination, Gibbons admitted that the Settlement restricts his ability to solicit further bids for Marvel. Under the Settlement, he would only be able to support an alternative plan if it meets the Third Amended Plan's definition of a "Superior Proposal" and the Secured Lenders and Toy Biz each find the alternative proposal agreeable. However, he also testified that he has a responsibility to call the court's attention to any significant offer that is made, whether or not it qualifies as a Superior Proposal under the Third Amended Plan.

The Creditors Committee called Steven Strom to the stand. Strom is a managing director at Chanin & Company and an advisor to the Creditors Committee. He assists them in negotiations and in evaluating the size and nature of their unsecured claims. Strom testified about his negotiations with Toy Biz and the Secured Lenders on behalf of the Creditors Committee, and the resulting agreement that was reflected in the Second Amended Plan. He testified that the Settlement breaches the MFN clause he negotiated with Toy Biz. He also testified that the new warrants assigned to equity holders in the Third Amended Plan will dilute the value of the warrants that the unsecured creditors are due, and he estimated the loss to unsecured creditors to be approximately $800,000. As part of his calculations, he assumed that the price of Newco stock would rise so that the equity holders would exercise all of their warrants.

Chase called Robert Martin to the stand. Martin is a managing director of the invest-

ment bank Salomon Smith Barney, and head of its financial restructuring group. Martin testified that, in his opinion, the unsecured creditors' warrants would not be materially negatively affected by the proposed settlement. Chase offered into evidence a report that Martin had written outlining his opinion. He testified that the new warrants could, at most, negatively affect the unsecured creditors' warrants by $323,000. He noted that this was less than one percent of the total value of the outstanding unsecured claims, and less than three percent of the recovery that the unsecured creditors were to receive under the Second Amended Plan. He testified that this possible negative effect, even at its greatest, is not "materially negatively" affect the unsecured creditors.

Chase also called Susan Atkins. Atkins is a vice president in the special loan group at Chase. Atkins testified that she had evaluated the most recent offer for Marvel by the Icahn interests, and that she had determined the return on the Secured Lenders' claims to be 70 cents per dollar of claims. She further testified that the value of the Third Amended Plan to Secured Lenders would be somewhere between 65 and 82 cents per dollar.

The Equity Committee called Vincent Intrieri to the stand. Intrieri is a portfolio manager at Stonington Management Company, which is the administrative manager of Westgate International (part of "the Icahn interests"). Intrieri testified about the offers that the Icahn interests have made for Marvel in the past few months. He testified that these offers had each been rejected, and that in his opinion these rejections were inexplicable. He testified that the trustee appeared to be unwilling to support any proposal that did not have the support of the Secured Lenders, and that the Secured Lenders appeared unwilling to support any offer by the Icahn interests.

## II. DISCUSSION

### A. What is the Standard for Considering a Settlement in Bankruptcy?

Bankruptcy Rule 9019(a) provides that the court may approve a compromise or settlement "on motion by the trustee and after a hearing on notice to the creditors, the United States trustee, the debtor and indenture trustees."

 There are four major factors that a court should consider when determining the "fairness, reasonableness, and adequacy of a settlement." *In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D.Pa.1992) (citation omitted). In the context of a settlement of litigation, the court should consider:

(1) the probability of success in the litigation;

(2) difficulties to be encountered in collection;

(3) the complexity of the litigation and related expense and inconvenience; and

(4) the interests of the creditors.

*Id.* The court must also consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). This court has described the ultimate inquiry to be whether "the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.,* 211 B.R. 798, 801 (D.Del.1997).

### B. Is the Settlement Fair and Reasonable?

Gibbons, the trustee for the Debtors, has explained the terms of the Settlement to the court in detail, and has submitted a copy of the stipulation and agreement between the parties. In brief, Toy Biz and the Secured Lenders have agreed to add three new series of warrants for Newco stock under their reorganization plan, to be distributed among equity holders. In return, Gibbons has agreed to release Toy Biz, the Secured Lenders, and others from the claims raised in the Perelman litigation, to hold off on his appeal of the Toy Biz governance issue, and to support the Toy Biz plan of reorganization.

The parties supporting the Settlement have produced evidence that suggests the concessions Gibbons has made under the Settlement do not possess much value. First, they suggest that Marvel would be unlikely to succeed on the claims in the Perelman

litigation against the entities with whom Gibbons proposes to settle. Gibbons testified at the hearing that he had spent a substantial amount of time investigating the Perelman litigation claims. He concluded that these claims would face many "problems" if they were litigated. He explained that there were several legal obstacles to the claims, and that he had been unable to find significant factual support for the claims. Gibbons submitted a report to the court describing his investigation and explaining his conclusions. Second, it appears that, even without the Settlement, Gibbons would support the Toy Biz reorganization plan. He testified about his attempts to solicit outside bids for the Debtors. He offered the testimony of a financial advisor from Houlihan Lokey, William Peluchiwski, who was involved in these solicitation efforts. They both testified that they had only received offers from one bidding group—the Icahn interests—and that they considered the Toy Biz plan to be a better deal for the Debtors' creditors than the Icahn offer. Chase, one of the Secured Lenders, also offered testimony from one of its employees, Susan Atkins. Atkins testified that Chase had evaluated the Icahn offer, and had concluded that the Toy Biz plan would potentially provide a greater return to the Secured Lenders.

■ The court appointed a trustee in this case to provide an objective view on the Perelman litigation, and to be a neutral party in negotiations between the parties. Absent evidence that the provisions of the Settlement are unreasonable, the court will defer to the trustee's judgment. Gibbons has demonstrated to the court that he has analyzed Marvel's options carefully, and has relied on financial and legal consultants in performing this analysis. No opposing party has presented evidence that creates substantial questions about Gibbons's assessment that this Settlement benefits the estate. Thus, the court finds that the terms of the Settlement are fair and reasonable.

C. *Do the Terms of the Settlement Unfairly Impact on Unsecured Creditors?*

The Creditors Committee complains that the Settlement reduces the value that will go to unsecured creditors under the reorganization plan. Thus, the Creditors Committee argues, the Settlement is not in the "best interests of the estate and its creditors." It also argues that the Settlement breaches the terms of the agreement it reached with the plan proponents that was reflected in the Second Amended Plan.

To the extent that the Creditors Committee argues that Toy Biz and the Secured Lenders have breached an agreement with them, the issue is not one for the court to resolve at this time. The parties reached that agreement among themselves, and the terms of the agreement are irrelevant to the question of whether the court should approve the Settlement.

The court will, however, consider the argument that the Settlement terms are not in the best interests of the estate and its creditors. The Creditors Committee claims that the unsecured creditors' warrants will lose substantial value if the court allows the plan proponents to pledge three new series of warrants to equity holders. The Creditors Committee called Steven Strom, from Chanin & Company, who testified that the new warrants would dilute the unsecured creditors' warrants by approximately $800,000.

However, Gibbons and Chase also offered testimony from financial experts on the dilution issue. Peluchiwski testified for Gibbons that the unsecured creditors committee would lose, at most, $140,000. Martin testified for Chase that they would lose, at most, $323,000. Both Peluchiwski and Martin indicated that these losses were very speculative, and that they expected the loss would be much less than these maximum numbers, but that in any event the loss was not material when compared with the total recovery due to unsecured creditors.

■ The Creditors Committee has only raised the possibility that, in a worst case scenario, its constituency might lose some value to their warrants. The court finds that this speculative loss does not unfairly impact unsecured creditors. The court concludes that the Settlement is in the best interests of the estate.

### D. *Is the Settlement a Sub Rosa Plan?*

Finally, each of the objecting parties complains that the Settlement is nothing more than a *de facto* plan of reorganization. They claim that the terms of the Settlement effectively bind Gibbons, eliminate his ability to entertain other offers, and lock in this reorganization plan to the exclusion of all others.

However, Gibbons entered into the Settlement after first concluding that the Toy Biz plan is the best alternative for Marvel. In other words, he only bound himself to support a plan that he had already intended to support. If any other parties were interested in bidding for Marvel, they had plenty of time to do so. Peluchiwski testified that many companies expressed interest, but that no company made an offer that was better than the Toy Biz plan. Moreover, there is nothing barring another party from making an offer even today—the Settlement only limits Gibbons in his ability to negotiate or encourage other offers. Gibbons testified that he would still bring any significant offers to the attention of the court.

The Settlement does not bypass the confirmation process. In fact, the entire Settlement is contingent upon subsequent confirmation and consummation of the Toy Biz plan. All parties will still have the opportunity to litigate the details of the reorganization plan, and to explain to the court why they believe the plan is not confirmable. Thus, the court finds that the Settlement is not a *sub rosa* plan.

### III. *CONCLUSION*

For the reasons set out above, the court will grant the trustee's motion for an order approving the stipulation and agreement of settlement with Toy Biz, Inc., Secured Lenders, and others. The court will issue an order in accordance with this opinion.